**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| |
|---|
| Hyuna Lee, aka Vivian Lee,<br><div align=right>Plaintiff,</div><br><div align=center>-against-</div><br><br>Korea Innovation Center, aka KIC,<br>The Korea-U.S. Science Cooperation Center aka KUSCO,<br>National Research Foundation of Korea aka NRF,<br>and<br>Sihoon Ryu aka Sean Ryu,<br><div align=right>Defendants.</div> |

Civil Action Number: 25-635
**JURY TRIAL REQUESTED**

**AMENDED COMPLAINT**

Plaintiff, by her attorney (Michael) Hyunkweon Ryu, as and for her Complaint herein, alleges the following:

**Nature of Action**

1. Plaintiff (Vivian) Hyuna Lee ("Vivian") respectfully submits this Complaint alleging that Defendants Korea Innovation Center ("KIC"), Korea-U.S. Science Cooperation Center ("KUSCO"), National Research Foundation of Korea ("NRF"), and Sihoon Ryu ("Sihoon")[1] violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, (the "FLSA"), the Virginia Overtime Wage Act, Virginia Code § 401.-39, *et seq.* (the "VOWA"), the federal Equal Pay Act 29 U.S.C. § 206(d), *et seq.* (or alternatively, the Virginia Equal Pay Act Virginia Code §40.1-28.6 (the "VEPA")), Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII") (Prohibition against Gender Discrimination, Retaliation, and Hostile Work Environment), Virginia Human Rights Act, Virginia Code § 2.2-3905(B)

---

[1] Sihoon Ryu is not related to the plaintiff's attorney Michael Hyunkweon Ryu. They just happen to have the same last name. In order to avoid confusion due to common Korean last names, such as Kim, Lee, Ryu, etc., some individuals are referred to by English nicknames or Korean first names.

("VHRA") (Prohibition against Gender Discrimination, Retaliation, and Hostile Work Environment), and Virginia Code § 40.1-27.3 (Prohibition against Retaliation). They also intentionally inflicted emotional distress on Plaintiff and vicariously liable for it, and wrongfully discharged Plaintiff (*Bowman* claim).

## Jurisdiction

2.      This Court has subject matter jurisdiction over this matter pursuant to Va. Code Ann. § 17.1-513 because this matter involves damages exceeding $100.00, exclusive of interest.

3.      This Court has general personal jurisdiction over all Defendants because they are all the residents of Virginia. Further, the Court has personal jurisdiction over all Defendants pursuant to Va. Code §8.01-328.1 because they transacted business in this Commonwealth, contracted to supply services in this Commonwealth, and committed tortious acts in this Commonwealth.

## Venue

4.      Venue is proper in this Court pursuant to Va. Code Ann. § 8.01-262 because a substantial part of the events giving rise to this claim occurred in Fairfax County, Virginia, and each Defendant's principal place of business is in Fairfax County, Virginia.

## Right to Sue

5.      On December 17, 2024, the U.S. Equal Employment Opportunity Commission issued a right to sue letter for the claims in this complaint. Exhibit 1. 90 days from December 17, 2024 is March 17, 2025.

6.      On January 2, 2025, the Office of Civil Rights of the Office of the Attorney General of Virigina issued a right to sue letter for the claims in the complaint. Exhibit 2. 90 days from January 2, 2025 is April 2, 2025.

7.      As such, the Plaintiff timely raises the claims below, and has satisfied the condition precedent to the filing of the claims with this court.

## Parties

8.      Plaintiff Vivian was an employee of Defendants KIC, KUSCO, NRF, and Sihoon.

9.      Plaintiff is and was a resident of the State of the Commonwealth of Virginia during the relevant period.

10.     Defendant KIC is an unincorporated and unregistered business entity operating in the Commonwealth of Virginia without a license. KIC is also a division of KUSCO.

11.     Defendant KUSCO is an incorporated business entity registered and operating in the Commonwealth of Virginia.

12.     Defendant NRF is a foundation established and located in South Korea ("Korea"). It operates worldwide, including in the Commonwealth of Virginia. It is registered and operating in the Commonwealth of Virginia.

13.     Defendant Sihoon is a self-proclaimed president of an unincorporated and unregistered business KIC.

14.     Plaintiff Vivian was employed by Sihoon, KIC, KUSCO and NRF from February 2024 until August 2024.

15.     Defendants Sihoon, KIC, KUSCO and NRF (collectively "K.K.N. Integrated Employer" or the "Integrated Employer") are a single employer or an integrated employer for this action.

## Facts

Relationship of Sihoon, KIC, KUSCO and NRF.

16.     The Korean government funds Defendant NRF.

17. NRF is a separate entity from the Korean government.

18. NRF has been established according to special legislation for NRF.

19. NRF is equivalent to a foundation in corporate law in the U.S.

20. NRF's 2019 budget is $5.2 billion USD, including $67 million USD for its overseas operation.

21. NRF employs more than 400 individuals as set forth on its website, some of whom are assigned to operating, managing and supervising KIC and KUSCO, and more than 600 individuals as of December 2022 according to a Google search.

22. A Korean recruitment website indicates NRF employees 576 individuals in 2024.

23. Another Korean recruitment website indicates NRF employees between 500 and 1000 individuals.

24. NRF has a division called the Directorate for International Cooperation, which includes the following offices: Office of International Cooperation Planning & Management, Office of Cooperation Framework, and Office of International Networks.

25. NRF's Office of International Networks includes international exchange programs and international development functions.

26. NRF funds KUSCO to use it as its U.S. arm for achieving the goals and missions of NRF's Directorate for International Cooperation.

27. They share the same address 1952 GALLOWS RD STE 202, VIENNA, VA, 22182 - 3862, USA, and the same person Jung Her/Huh as their practically chief operating officer, or managing director.

28. KUSCO funds KIC to use it as its division rather than an independent business entity for achieving the goals and missions of NRF's Directorate for International Cooperation.

29. Sihoon is called 센터장, phonetically "Center Jang", meaning the chief of the center (KIC's full name is Korea Innovation Center as set forth above), and Sihoon claims that he has independent authority over the so-called KIC personnel; however, NRF exercises control and supervision over Sihoon and over the operation of KIC, including Sihoon's treatment of the so-called KIC personnel, including Plaintiff Vivian as set forth below.

30. NRF controls KUSCO by, without being limited to:

a) appointing NRF's president as KUSCO's president,

b) sending NRF's mid-level managerial employee as KUSCO's highest-ranking manager, who is currently Mr. Jung Her/Huh.

c) controlling KUSCO's budget, including payroll, and

d) instructing KUSCO on its employment terms, conditions, and policies, including employee handbooks.

31. KUSCO controls KIC by, without being limited to:

a) keeping KIC unincorporated in the Commonwealth of Virginia or any other states in the U.S., and registering KIC Washington as KUSCO's fictitious name,

    i. Specifically, due to the unincorporated nature of KIC and being a division of KUSCO, when Sihoon wanted to hire a Trainee through the J1 visa sponsorship program, he or KIC could not sign the required documents. Therefore, despite Mr. Her/Huh's objections, Sihoon used KUSCO's official seal to execute the said J1 visa sponsorship documents to the State Department of United States,

b) paying all personnel working under the banner of KIC on KUSCO's payroll, and

c)     exercising supervisory authority over KIC by engaging in KIC's labor relations, including handling KIC employees' grievances.

32.     NRF controls KIC by, without being limited to:

a)     funding KUSCO which in turn funds KIC,

b)     funding KIC through NRF's grants to KIC's programs, which NRF instructs KIC to develop according to the specifications provided by NRF,

c)     determining the hiring and firing of KIC's key personnel, including 센터장, the chief of center, i.e., Sihoon, and engaging in setting employment terms and conditions, including instructing revisions in KIC's employee handbooks,

d)     investigating KIC's labor relations, including handling KIC's employee grievances, using employees on NRF's payroll, not on KUSCO's or KIC's payroll,  and

e)     instructing KIC on KIC's labor relations, including admonishment and reprimand.

33.     NRF interviewed and hired Sihoon and determined his employment terms and conditions.

34.     NRF instructed, admonished or reprimanded Sihoon on his conduct toward personnel, including Vivian, and evaluated his performance.

35.     In 2023 and/or 2024, NRF received reports on hiring a Director for KIC.[2]

36.     NRF internally calls KUSCO in Korean "한국연구재단 미국사무소," which is phonetically han-kuk-yeon-ku-jae-dan mee-kuk-sa-mu-so, meaning NRF's U.S. office.

37.     NRF publicly states that KIC is a division of KUSCO.

---

[2] Director as used in this complaint is a title of an employee for KIC, and does not mean a member of the board of directors as the word director used in the U.S. corporate law. KIC uses the word Director as a title of its employees, and does not use the word Director to mean a member of the board of directors.

38.     The Integrated employer KIC, KUSCO and NRF has more than 15 full-time employees for each working day in each of 20 or more calendar weeks in the years of 2023 or 2024, or at least 6 full-time employees even if it were not to have at least 15 full-time employees as set forth above.

Vivian's employment with Defendants

39.     From June 2022 until April 2023, Plaintiff Vivian Lee worked as an M.B.A. project management intern for the Defendants.

40.     After obtaining her M.B.A. degree from George Washington University in May 2023, Vivian was hired by an investment company as the Director of Investor Relations from June 2023 until she started working for KIC.[3]

41.     While Vivian was at the investment company, she still wanted to work for a company like KIC, so when she learned that KIC was hiring, she applied.

42.     Plaintiff took a substantial pay cut to work for KIC.

43.     KIC operates "Technology Exchange & Transfer" programs approved by NRF, and other Korean government-funded organizations, such as the Commercialization Promotion Agency for R&D Outcome ("COMPA").

44.     COMPA is funded (and controlled) by the Korean government, but they are separate entities to the government.

45.     KIC's programs are designed to support the commercialization of the participants' technologies and promote entrepreneurship of the participants, usually, technology start-ups.

46.     The funding organization (such as NRF and COMPA) selects the institutional participants, who are usually Korean start-up companies or universities.

---

[3] This Director also is a title for an employee, and does not mean a member of the board of directors of a corporation.

47. The institutional participants send individuals to the U.S. to participate in the program.

48. Most KIC programs consist of four or five and up to ten half-day online sessions.

49. KIC also operates in-person three-week programs in the United States, inviting individuals from institutional participants in Korea to the United States.

50. These programs host individual participants in various locations in the United States, primarily Washington DC, the East Coast, and Silicon Valley, the West Coast.

51. KIC has two groups: one in Washington, DC, and the other in Silicon Valley.

52. The group in the Washington, DC area (more accurately located in Vienna, Fairfax County, Virginia) covers the East Coast and is commonly called KICDC by KIC, KUSCO and NRF.

53. These relatively long-term programs (three weeks in the U.S.) involve hosting the individual participants, including booking hotels, planning field trips to technology companies, such as Google, arranging seminars for networking with U.S. professionals, such as intellectual property lawyers and venture capitalists, collaborating with the educational institutions, including scheduling with schools such as the George Washington University, for classes and training and monitoring the individuals' level of participation.

54. Mostly Directors and sometimes Senior (Program) Managers handle long-term programs, and Senior Managers and (non-senior) Managers handle the rest of the programs-which are mostly online programs.

55. Directors also supervise Senior Managers and (non-senior) Managers for the programs they handle.

56. Directors develop new programs per the client's (e.g., NRF, and COMOPA) specifications.

57. Directors also act as the main point of contact for KIC's (regional) programs, i.e., KICDC.

58. Directors organize and host yearly Demo Day.

59. Vivian's predecessor was Mr. Yong Bum Kim.

60. When Vivian was hired as a Director, KIC also hired Hyung Jin Yoon as a Senior Manager.

61. In June 2024, KIC hired Sewon Lee as a Trainee.

62. Vivian's predecessor, Mr. Yong Bum Kim and Vivian's work are equal, requiring equal skill, effort, and responsibility, performed in the same office and in the same neighboring areas such as Washington, D.C., and Northern Virginia.

63. However, Vivian, a female employee, was paid substantially less than her male predecessor, Mr. Yong Bum Kim. Vivian was paid $70,000 a year, while her predecessor Mr. Yong Bum Kim was paid more than $100,000 a year.

64. KIC pays a male Trainee $70,000 a year and paid Deputy Directors over $80,000 a year.

65. Vivian's male predecessor received the following support for his work as the Director:

a) KIC authorized and paid for the male predecessor several speakers/guest lecturers and outside advisors.

b) KIC, per its employee handbook, provided career development support ($5,000 a year) to her male predecessor.

9

c)      KIC authorized and paid fees for participating various industry trade events, such as SelectUSA Investment Summit, and Bio International Convention, for Vivian's male predecessor for participating in meetings and trade shows.

66.    KIC also pays these participation fees for the current Senior Manager (male) and Trainee (male).

67.    When the Senior Manager (male) wants, KIC pays $300 per 1 hour presentation for outside lecturers.

68.    Sihoon invites the Senior Manager (male) and Trainee (male) to various network opportunities.

69.    On the other hand, KIC refuses to provide such support as what set forth above to Vivian (female).

70.    Sihoon, the self-declared president of KIC, a non-incorporated unlicensed business entity, which NRF states its US Office's division (i.e., KUSCO is NRF's U.S. Office, and KIC is KUSCO's division), who is still the highest in the chain of command in KIC, constantly belittled, humiliated, insulted, intimidated, hurt and undermined Vivian as follows.

a)      He intentionally excluded Vivian from meetings and networking dinners with Vivian's program participants, and when Vivian raised that issue, he told her "본인 과제도 아닌데 뭘 그렇게 관심가져요? 관심 끄세요." Which is translated as "It's not even your program, why are you so interested? Mind your own business."

b)      He intentionally undermined Vivian's authority to supervise and discipline the Trainee (male) by encouraging and even supporting his insubordination and treated her as if she was at the bottom of the chain of command or authority in KIC even though she was right below Sihoon, and higher than everyone else in KIC. For example, when

10

the Trainee (male) refused to follow Vivian's instructions and guidance, and when she brought that up to the attention of Sihoon (male), he ignored her, and often intentionally undermined Vivian's authority as Director by publicly telling him to do what he wants no matter what Vivian wants.

71.     Songhee Han (female) is the Operations Manager of KIC. She told multiple female employees at KIC, including Vivian, but not limited to her, that "센터장님은 여우짓하는 사람들을 좋아하니까 여우짓 좀 하세요." These Korean sentences are translated as 'Sihoon likes foxy ladies, so you should behave like a foxy lady.' The word foxy lady can also be translated as flirtatious ladies, sexually or femininely playful ladies, ladies showing off feminine charms to please males and get what she wants, or a coquette (i.e., a girl or woman who knows how to flatter and manipulate men with her feminine charms to get what she wants).

72.     As a reward for being a sympathizer, although the Operations Manager do not participate in networking dinners, Songhee (female) was invited and did participate in such dinners. On the other hand, although Directors participate in such dinners, and even Managers were invited to such dinners when such dinners were for their programs' participants, Sihoon excluded Vivian from such networking dinners. Sihoon even invited the Trainee (male), but he intentionally excluded Vivian, hurting her professional career development by taking away her networking opportunities.

73.     Sihoon, not only excluded her from such career opportunities but also intentionally, unfairly, unjustly accused and criticized her publicly to crush Vivian's spirit and defame her.

     a)     Sihoon publicly criticized Vivian for coming to work a little late, which was not due to tardiness but for work-related reasons, including meeting with a KIC

client. Sihoon never says anything publicly when male employees (Manager and Trainee) come to work late or even do not come to work.

b)    Sihoon even scolded Vivian for working after 5:30 p.m., accusing her of unnecessarily incurring overtime when she adjusted her work schedule to collaborate with a person in a different time zone for a program. However, Sihoon does not say anything about (Senior) Managers (males) working beyond 5:30 p.m., including evening dinner meetings with local people, paid for by KIC.

c)    Sihoon did not publicly say anything to the Trainee who intentionally disappeared from a program meeting that Vivian was in charge of, and humiliated her by dismissing her request for discipline of the Trainee by publicly letting the Trainee decide whether or not he would listen to her.

74.    Sihoon instructed Vivian not to communicate with her predecessor or other KIC former employees despite needing to ask questions about her work because she did not have sufficient time to take over her predecessor's job at KIC. On the other hand, Sihoon permits (Senior) Managers (males) to communicate with former employees freely. However, when Vivian was not able to make progress due to limited information, Sihoon criticized her for not contacting them and lacking communication skills.

75.    Sihoon took such self-contradicting, about-face actions to falsely accuse her of poor communication skills. Kakao Talk is one of Korea's most preferred forms of communication in business settings. Sihoon instructed KIC employees not to use Kakao Talk for KIC's work. Although COMPA and program participants such as universities wanted to communicate through Kakao Talk with Vivian, she told them to communicate by emails due to Sihoon's instruction. As a result, they complained about her for not using Kakao Talk, and then

Sihoon accused Vivian of having poor communication skills and painted her as strange. But, when Vivian used Kakao Talk because of such complaints, Sihoon criticized her for being informal with her work and for not following her superior's instructions. Sihoon, however, did not criticize or discipline (Senior) Managers (male) for using Kakao Talk but permitted them to use it freely.

76.    Along the same line, Sihoon blamed Vivian for Geoge Washington University's refusal to use DocuSign, rebuking and publicly humiliating her for that as being responsible for that. However, the truth was that both Sihoon and Vivian received prior notices from George Washington University that they would not use DocuSign due to security concerns.

77.    Regarding Sihoon's false accusation of George Washington University's complaint of Vivian's communication issues, and George Washington University's unwillingness to enter into a contract with KIC allegedly due to Vivian's fault, she met with the university's employees per NRF's instruction.

a)    An employee confirmed that George Washington University did raise communication issues, but it was for a different KIC employee. The University said that Vivian was doing great and even told Sihoon about that to clarify that it was not Vivian's communication ability. The University's employee did not understand why Sihoon falsely accused Vivian of communication issues, and guessed it was because of Sihoon's limited English or two-faces.

b)    A different employee confirmed that George Washington University never told KIC that they would not enter into a contract with KIC and even confirmed that he explained that to Sihoon in person.

13

78. When she complained about the inconsistent and disparate treatment by Sihoon, he criticized her as overreacting and aggressive. Sihoon never accused any male employees of being aggressive. Sihoon called other female employees aggressive as well when they complained to him for disparate treatment or his conduct.

79. Sihoon scrutinized Vivian's work to pick on her. For example, when an intern was hired following a proper procedure in June 2024, and he approved the hiring in July 2024, he demanded that Vivian explain why the intern was hired. Sihoon never did that to male employees.

80. Sihoon not only intentionally refused to provide Vivian with the support that her predecessor received and even the current Managers receive, but he also backstabbed her to undermine her achievements. Vivian organized a network meeting for her program's participants with a DC law firm; however, when Vivian was not there, Sihoon spoke badly of her for organizing the meeting and said that the meeting was a complete waste of time and useless. Sihoon did not even come to the meeting, so he did not even have any personal knowledge of what happened in the meeting.

81. Such disparate treatment, including Sihoon's defamatory statements about her work performance, tolled Vivian emotionally and also hurt Vivian's reputation as a professional. She was so emotionally distressed that she had to see doctors, and she is currently under the care of doctors to overcome the emotional distress intentionally inflicted on her by Sihoon.

82. At one point in time, Sihoon demanded Vivian hire an intern against the hiring procedure. Vivian did not refuse to hire that intern but explained the irregularity and indicated that she would follow the proper procedure, but Sihoon got furious. At another time, Vivian also pointed out that the current KIC Trainee violates U.S. immigration law and KIC's policy, but

14

Sihoon refused to correct it. Sihoon got angry and encouraged the Trainee (male) to ignore Vivian and humiliated Vivian in front of her subordinate.

83.    On April 5, 2024, Vivian reported to Mr. Her/Huh of KUSCO Sihoon's pressure to hire the said intern and his abusive, harassing, defamatory, discriminatory and retaliatory conduct against her. Subsequently, April 10, 2024, NRF conducted a Zoom meeting with Sihoon. NRF instructed Sihoon to conduct one-on-one meetings with all employees to hear their complaints and report back to NRF. Sihoon refused to hold one-on-one meetings but held meetings with each employee with Songhee, his confidante lieutenant, present.

84.    Initially, Sihoon thought the complaint was made by another female employee, who left KIC and retaliated against her. He swore that he would not leave her alone.

85.    He eventually held a meeting with Vivian on April 15, 2024. Vivian met with Sihoon and Songhee to tell them the abusive and discriminatory treatment and request changes.

86.    Sihoon responded as follows.

a)    Sihoon told Vivian that he knew that Vivian made that complaint, and told her to tell him who in NRF she made the complaint to, and the reason why she made the complaint to KUSCO.

b)    Sihoon even ridiculed Vivian saying that NRF or KUSCO could not discipline him.

c)    Songhee constantly talked over Vivian to block her from talking to Sihoon.

d)    During the meeting, he showed the attitude that Vivian's complaint meant nothing to him by looking outside the window and stating nonchalantly that it was hailing outside, he never had had hails when he used to be in California, and he hoped that his

15

car did not get damaged by the hail. Sihoon wanted to show that he was not interested in talking to her or concerned about her complaint, and more interested in his car. This action was intentionally designed to humiliate and belittle Vivian, making her feel helpless and discouraged.

e)    Sihoon also told Vivian that NRF told him that the investigations were only for the sake of going through the motion, that her complaint would not do any harm to him, that he had experienced this kind of labor relations troubles many times, and that this kind of complaints would not do any harm to him. Vivian reported Sihoon's recalcitrant statements to Mr. Her/Huh of KUSCO because she could not believe that NRF really told him so. Mr. Her/Huh denied such statements by NRF, but it is unknown whether NRF took appropriate actions to Sihoon's disregard and dismissal of NRF's supervisory actions requiring corrective measures.

f)    After the meeting, Sihoon behaved as if nothing happened, showing his complete disregard to damages to Vivian through his defamatory, discriminatory and harassing conduct to her.

87.    Right after the meeting, Sihoon sent an email containing his excuses and self-serving statements, laying the groundwork to terminate her in retaliation.

88.    After the meeting, Vivian found it difficult to believe that NRF and KUSCO were taking proper measures to protect her because

a)    Mr. Her/Huh texted Vivian that Sihoon told him that everything was resolved- this was not true.

b)    Nothing was done to remedy the situation.

c)    The harassing and discriminatory conduct did not stop but only got subtle.

16

89.     As such, Vivian drafted a written complaint and sent it to Mr. Her/Huh to be reported to NRF and the Korean government's Ministry of Science and ICT, which she believed would do justice to the situation. It was around April 26, 2024. Mr. Her/Huh asked if he could share Vivian's complaint with Sihoon. Vivian agreed.

90.     NRF decided to conduct an on-site internal investigation, which was scheduled for May 2024. Sihoon learned about the internal investigation. After that, Sihoon wanted to have another meeting with Vivian. She demanded for it to be recorded, but Sihoon refused. He insisted on meeting her without a recording. Eventually, they met with Mr. Her/Huh, and Vivian recorded the meeting after notifying them. They met on April 29, 2024.

91.     At the meeting on April 29, 2024, Sihoon for the first time learned that Vivian's complaint was reported to the Ministry of Science and ICT as well. Sihoon got very angry.

92.     At the meeting, Vivian demanded Sihoon write an apology, but he refused to do so and denied everything.

93.     Right after the meeting on April 29, 2024, Sihoon interrupted Vivian and Mr. Her/Huh's conversation in the hallway and told Vivian that he would extend her trial period. The next day he sent a letter justifying his decision with self-serving pretextual statements.

94.     She was not paid the proper benefits with the excuse that she was still in the trial period. However, the original employee handbook did not say anything about the extension of the trial period and entitled her to various benefits after the completion of the first 90 days of employment.

95.     In May 2024, the NRF on-site internal investigation team interviewed and recorded the testimonies of then-current and former employees. The recorded testimonies include Vivian's testimony that she heard from a former employee that Sihoon threatened that former

employee (female) as Sihoon would not leave her alone unless she brought Sihoon evidence to justify the termination of Vivian, and Mr. Her/Huh's testimony that he heard the same from the same former employee. Both Vivian and Mr. Her/Huh testified that the employee who was threatened had a recording of that threat.

96.     During this ordeal, Vivian suffered emotionally and physically, and she lost weight, could not sleep or eat, and on April 30, 2024, even fainted while drawing blood at a hospital.

97.     NRF made the following findings:

a)      NRF found that Sihoon's remarks such as he would not be disciplined despite Vivian's complaint to NRF and KUSCO, and Vivian was aggressive, and she could be terminated sounded threatening or hostile to her, and constitutes unlawful harassment, particularly in view that Vivian was in a trial period.

b)      NRF found that Sihoon had the managerial authority to set Vivian's pay rate and change her job responsibility, and as such, Sihoon did not discriminate Vivian against other employees. This finding did not address the gender discrimination, and Equal Pay Act violation, probably due to the fact that gender discrimination and pay disparity based on gender is so prevalent in Korean culture. This finding of NRF appears to have emboldened Sihoon to step up his discriminatory and retaliatory conduct.

c)      Sihoon's conduct of unfairly hiring employees violated equal opportunity in employment.

98.     NRF also required Sihoon to take the following corrective measures.

a)      Prevent the recurrence of unlawful harassment. The NRF will revisit this issue in three months. It is uncertain if NRF did so.

b)      Complete training on the prevention of unlawful harassment.

c)      Complete training on leadership and ethics in research.

99.     However, despite NRF's instructions, Sihoon continued to harass and discriminate Vivian. He focused on harassing and discriminating Vivian using his managerial authority NRF confirmed.

100.    In the meantime, around the time when Sihoon sent the extending Vivian's trial period with pretexts, Sihoon told at least one KIC employee that he would fire Vivian after her program ended in July.

101.    After the NRF investigation, Mr. Her/Huh told Vivian that they took remedial measures, but he told her 'American lawyers make things complicated and I am telling you for your benefit that if you take the next step the people above would not like it.' NRF also told Vivian that they gave Sihoon three months to improve and they would watch him, and told her 'we spoke with lawyers and they are split half and half as to whether it would be worth for you to bring a suit for these issues, and as such, you should make a good judgment.'

102.    However, they (i.e., KUSCO and NRF) did not take any measures to stop Sihoon from continuing his discriminatory practices, including discriminatory pay and extension of the trial period, with the excuse that Sihoon had the authority to make those decisions and Vivian did not have the right to challenge it. In fact, when Vivian asked for compensation for harassment in work place and unfair disparate treatment, they told her that they did not have such provisions.

103.    The extension of Vivian's trial period was retaliatory as shown in the close temporal proximity between the letter and the event that ticked him off, i.e., his discovery of the complaint to the Ministry of Science and ICT of the Korean government.

104.    The extension of Vivian's trial period was discriminatory because historically, no male employees received such an extension while Vivian's performance evaluations by the participants of her program was the best in KIC's history.

105.    Despite NRF's findings and instructions, Sihoon did not take the required training, but stepped up his subtle discrimination and retaliation. He scrutinized Vivian's communications and even appeared to have monitored her computer access, wrongfully accused her of attempting to access other employees' personnel files, withheld all support, subjected her to an exceptionally unfairly massive workload, undermined and humiliated her and encouraged her subordinates to be insubordinate to her, and falsely accusing her of poor communication skills.

106.    Sihoon's defamatory, abusive, harassing, discriminatory and retaliatory conduct inflicted tremendous emotional distress on Vivian. She is seeing several health professionals as a result, and her family life has been negatively affected from the emotional distress intentionally inflicted upon her by Sihoon.

107.    Sihoon's discriminatory and retaliatory conduct, particularly the conduct of the one who allegedly has the full power of supervising, firing, hiring, and disciplining Vivian, created a hostile work environment, targeting Vivian and severely compromising her ability to work effectively. The toxicity of the work environment and the animus shown by Sihoon against Vivian disrupted her work, making it extremely difficult for her to work normally and hampering her career development substantially.

108.    Despite all the roadblocks that Sihoon set up to make Vivian fail, she even achieved a new KIC record of successfully developing new partner institutions in the U.S.,

which her predecessor worked hard for but could not achieve, and she successfully completed her program.

109. On July 26, 2024, KIC created a new employee handbook that was changed substantially from the original. The new handbook changed the trial period from 90 days to 90-180 days, and substantially reduced the reference to retaliation. Songhee ordered Vivian to sign the new handbook, but Vivian refused.

110. On August 5, 2024, Vivian had a debriefing session for her program with the participating institutions and the Ministry of Science and ICT, a ministry of the Korean government that funds COMPA, which funds KIC's program that Vivian managed.

111. During the session, an issue of the conduct of a group of participants during the program surfaced, and Vivian reported it truthfully. That conduct was already the subject of complaints by other participants. Vivian, as the one in charge of the program, wanted to handle the conduct with understanding that they were still young college kids but also according to the rules and regulations relating to the funding so that the future participants do not repeat the same mistake. In fact, fairness was what other participants, and the funding organizations wanted because the program is very popular and there is a competition for the limited seats in the U.S. on-site programs. This is an opportunity to improve participants' technologies for commercialization for the world's biggest market, the U.S. market. Who would not want such an opportunity?

112. However, Sihoon wanted to cover up that issue, and he did. But as stated above, when it came up during the session, Vivian answered truthfully.

113. While in a meeting with COMPA on August 13, 2024, it appeared that Sihoon learned about what Vivian did in the August 5, 2024 meeting. On August 27, 2024, as he

previously swore when she first reported her complaint to KUSCO and NRF, he fired her on several pretexts.

114.    On August 27, 2024, immediately following the termination letter, KIC attempted to trick her into waiving her rights. They sent an agreement calling it a separation agreement, and claiming that it was to "help ease your transition" despite saying it included "a release of claims." They conditioned the payment of the alleged severance payment of $5,833.33 on signing the agreement. But, as any lawyer could tell, the document was a settlement agreement starting with the first section titled "Non-Admission of Liability" of the employer.

115.    The termination is abusive, harassing, discriminatory and retaliatory, as shown above. Vivian was terminated from her employment because she refused to conform to the gender-discriminatory caste system that Defendants created and reinforced.

116.    Sihoon's discriminatory and disparate treatment to female employees was nothing new. Sihoon discriminated against other female employees as well as Vivian. For example, as he did to Vivian, he picked on female employees' attitudes, reactions and words as aggressive. Even if Sihoon had constant discord with other employees, whether they were male or female, he never used such words as "aggressive" towards male employees, systematically stifling female employees' complaints for equal treatment to male employees.

117.    Further, Sihoon humiliated and insulted a female employee by constantly bringing up her background as a judo athlete and criticizing her for not being intelligent because she was a judo athlete. Koreans have a prejudice and bias against athletes, assuming they did not study at school, skipping classes.

118.    Sihoon also picked on the time that female employees came to work, although he told NRF that as long as the employees worked 40 hours per week, his policy was to keep the

work hours flexible. However, Sihoon did not say anything about the time that the male employees came to the office, no matter what time they came in. In fact, even when they did not come to work at all, he did not say anything.

119.    The sexually discriminatory atmosphere that Sihoon created was so prevalent that Operations Manager Songhee even casually told female employees to be a "foxy lady to Sihoon" as set forth above. Sihoon reinforced the gender-based caste system that he created in KIC by punishing anyone who did not accept the disparate treatment based on gender but also elevating Songhee, who not only accepted such gender-based caste system but became an active sympathizer to the caste system to his *de facto* deputy, a confidante lieutenant.

120.    Songhee actively participated in the gender role in the caste system not just by telling other female employees to be foxy ladies, but also by actively carrying out such a role by preparing a morning fruit tray for Sihoon almost every morning and sharing it with him in his office. As an example of reward to Songhee, she was invited to networking opportunities that the traditional Operations Manager did not attend.

<div align="center">

**Count 1:**
**Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***
**(Disparate Treatment Based on Gender)**
**(Gender Discrimination)**

</div>

121.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

122.    Plaintiff and Defendants herein are an employee and employers, respectively, for purposes of the definition set forth in 42 U.S.C. § 2000e *et seq.*

123.    Plaintiff belongs to the female sex or gender.

124.    Defendant Sihoon is the direct supervisor of Plaintiff.

125.    Defendant Sihoon is the highest authority with full power over the employment of Plaintiff in KIC.

126.    Defendant Sihoon claims he is the president of KIC.

127.    42 U.S.C. § 2000e-2(a) provides that "it shall be an unlawful employment practice for an an employer...to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's... sex."

128.    As set forth above, Defendant's conduct was in violation of 42 U.S.C. § 2000e *et seq.* because during the course of Plaintiff's employment with Defendants, they, by and through their agents and employees, discriminated against Plaintiff in the terms, conditions, and privileges of employment in various ways, in substantial part because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

129.    As a result of the gender discrimination perpetrated by Defendants as set forth above, Plaintiff suffered financial loss, entitling her to the front pay and back pay, injury to her career development, humiliation, emotional distress, and mental anguish.

130.    Defendants even terminated Plaintiff because she refused to conform to the gender-discriminatory caste system that Defendants created and reinforced.

131.    As a direct and proximate result of gender discrimination, Plaintiff has suffered and continues to suffer damages, including past and future loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress with accompanying physical symptoms that require the care of health care professionals, inconvenience, embarrassment, and humiliation

132. Due to the especially malicious or reckless act of Defendants, Vivian is also entitled to punitive damages.

133. As such, Plaintiff is entitled to the back pay, front pay, compensatory damages for lost benefits, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation, attorney's fees and cost, and punitive damages.

**Count 2:**
**Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)**
**(Retaliation)**

134. All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

135. Plaintiff and Defendants herein are employee and employers, respectively, for purposes of the definition set forth in 42 U.S.C. § 2000e *et seq.*

136. Plaintiff belongs to the female sex or gender.

137. Defendant Sihoon is the direct supervisor of Plaintiff.

138. Defendant Sihoon is the highest authority with full power over the employment of Plaintiff in KIC.

139. Defendant Sihoon claims he is the president of KIC.

140. Plaintiff engaged in a protected activity. She reported the harassment and discrimination and made internal charges thereof to Defendants. She also assisted with, participated in and testified for an internal investigation.

141.    As a result, Plaintiff suffered adverse employment actions in the terms and conditions of employment, including but not limited to termination, the refusal of promotion, and the refusal of benefits.

142.    Plaintiff has suffered and continues to suffer damages, including past and future loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation.

143.    Due to the especially malicious or reckless act of Defendants, Vivian is also entitled to punitive damages.

144.    As such, Plaintiff is entitled to the back pay, front pay, compensatory damages for lost benefits, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation, attorney's fees and cost, and punitive damages.

**Count 3:**
**Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*-**
**(Hostile Work Environment Based on Gender)**

145.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

146.    Plaintiff and Defendants herein are employee and employers, respectively, for purposes of the definition set forth in 42 U.S.C. § 2000e *et seq.*

147.    Plaintiff belongs to the female sex or gender.

148.    Defendant Sihoon is the direct supervisor of Plaintiff.

26

149.    Defendant Sihoon is the highest authority with full power over the employment of Plaintiff in KIC.

150.    Defendant Sihoon claims he is the president of KIC.

151.    Defendants KUSCO and NRF do not dispute Sihoon's claim of the highest authority and full power set forth above, but in fact, NRF confirmed Sihoon had the sole discretion over Plaintiff's employment.

152.    Due to Plaintiff's gender and due to her refusal to accept the gender-based caste system that Defendants created, Defendants made tangible employment actions including but not limited to firing, failing to promote, changing benefits, and setting pay or compensation amounts, and creating a hostile work environment.

153.    Additionally, Defendants created a hostile work environment by permeating the workplace with discriminatory requirements based on gender, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the working conditions of Plaintiff.

154.    Defendants failed and refused to adequately supervise, control, discipline, and/or otherwise penalize the discriminatory conduct.

155.    Defendant failed to take reasonable and necessary steps to eliminate sex discrimination from the workplace and to prevent it from reoccurring despite it having the power and duty to do so.

156.    Defendants terminated Plaintiff, despite repeated reports of the harassment and gender discrimination perpetrated against her.

157.    As a result of the hostile and offensive work environment perpetrated by Defendants due to Plaintiff's gender, and their failure to protect Plaintiff from gender discrimination, Plaintiff has suffered and continues to suffer damages, including past and future

loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation

158.    Due to the especially malicious or reckless act of Defendants, Vivian is also entitled to punitive damages.

159.    As such, Plaintiff is entitled to the back pay, front pay, compensatory damages for lost benefits, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation, attorney's fees and cost, and punitive damages.

<div align="center">

**Count 4:**
**Violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*-**
**(Retaliatory Hostile Work Environment)**

</div>

160.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

161.    Plaintiff and Defendants herein are employee and employers, respectively, for purposes of the definition set forth in 42 U.S.C. § 2000e *et seq.*

162.    Plaintiff belongs to the female sex or gender.

163.    Defendant Sihoon is the direct supervisor of Plaintiff.

164.    Defendant Sihoon is the highest authority with full power over the employment of Plaintiff in KIC.

165.    Defendant Sihoon claims he is the president of KIC.

166.    Defendants KUSCO and NRF do not dispute Sihoon's claim of the highest authority and full power set forth above, but in fact, NRF confirmed Sihoon had the sole

discretion over Plaintiff's employment despite the fact that NRF in fact had the power to investigate and instruct Defendant Sihoon as to Plaintiff's complaint, and NRF made the hiring decision of Sihoon. As a result, rather than stopping Sihoon's unlawful conducts, Defendants KUSCO and NRF emboldened Defendant Sihoon to aggravate the discrimination and even encouraged the retaliation.

167.    Due to Plaintiff's engagement in the protected activity and in retaliation thereto, Defendants created a hostile work environment by making tangible employment actions including but not limited to firing, failing to promote, changing benefits, and setting pay or compensation amounts, and permeating the workplace with discriminatory requirements based on gender, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of Plaintiff.

168.    Defendants failed and refused to adequately supervise, control, discipline, and/or otherwise penalize the retaliatory conduct.

169.    As a result of the retaliatory hostile and offensive work environment perpetrated by Defendants, Plaintiff has suffered and continues to suffer damages, including past and future loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation.

170.    As such, Plaintiff is entitled to the back pay, front pay, compensatory damages for lost benefits, lost career opportunities and advancement, other past and future pecuniary losses, including medical costs, emotional distress, inconvenience, embarrassment, and humiliation, attorney's fees and cost, and punitive damages.

**Count 5:**
**Violation of the Virginia Human Rights Act**

29

**(Gender Discrimination)**

171.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein, and particularly those allegations for the federal Title VII gender discrimination, and replaces the federal statue with the Virginia Human Rights Act, VA Code 2.2-3900, *et. seq.*

172.    Defendants are "employers" within the meaning of the VHRA. Va. Code Ann. § 2.2-3905(A).

173.    Va. Code Ann. § 2.2-3905(B)(1)(a) makes it an "unlawful discriminatory practice for: (1) An employer to: (a) Fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's … sex …;"

174.    Va. Code Ann. § 2.2-3905(B)(6) also bars an employer from using sex as a "motivating factor" for any employment practice, stating: "[e]xcept as otherwise provided in this chapter, an employer to use … sex … as a motivating factor for any employment practice, even though other factors also motivate the practice."

175.    Defendants discriminated against Plaintiff because of her sex including paying her less than male employees for substantially the same or equal work and denying her equal terms and conditions of employment.

176.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, emotional distress, and harm to her professional reputation.

177.    Plaintiff is entitled to all remedies available under Va. Code Ann. § 2.2-3908, including compensatory and punitive damages, injunctive relief, and attorney's fees.

## Count 6:
### Violation of the Virginia Human Rights Act
### (Retaliation)

178.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein, and particularly those allegations for the federal Title VII gender discrimination, and replaces the federal statue with the Virginia Human Rights Act, VA Code 2.2-3900, et. seq.

179.    Va. Code Ann. § 2.2-3905(B)(7) makes it an unlawful discriminatory practice for: "(7)(i) An employer to discriminate against any employees … because such individual has opposed any practice made an unlawful discriminatory practice by this chapter or because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

180.    Plaintiff engaged in protected activity by opposing Defendants' unlawful discrimination and/or participating in investigations or proceedings related to such discrimination.

181.    Defendants retaliated against Plaintiff by, among other things, subjecting her to adverse employment actions—including extending her probation, denying her benefits, and ultimately terminating her—because she opposed and reported discriminatory practices.

182.    As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including lost wages, emotional distress, and harm to her professional reputation.

31

183.    Plaintiff is entitled to all remedies available under Va. Code Ann. § 2.2-3908, including compensatory and punitive damages, injunctive relief, and attorney's fees.

**Count 7:**
**Violation of the Virginia Human Rights Act**
**(Hostile Work Environment Based on Gender)**

184.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein, and particularly those allegations for the federal Title VII gender discrimination, and replaces the federal statue with the Virginia Human Rights Act, VA Code 2.2-3900, *et. seq.*

185.    The VHRA prohibits employers to "otherwise discriminate against any individual with respect to … terms, conditions, or privileges of employment" in Va. Code Ann. § 2.2-3905(B)(1)(a) and "limit, segregate, or classify employees … in any way that would … adversely affect an individual's status as an employee" in § 2.2-3905(B)(1)(b).

186.    Va. Code Ann. § 2.2-3905(B)(6) further provides that using sex as a "motivating factor for any employment practice, even though other factors also motivate the practice." is an unlawful discriminatory practice.

187.    Defendants subjected the Plaintiff to an environment that was sufficiently severe or pervasive to alter her working conditions and "adversely affect [her] status as an employee" (Va. Code Ann. § 2.2-3905(B)(1)(b)), and alter her terms, conditions, or privileges of employment, creating a hostile or abusive work environment because of her sex.

188.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered damages including emotional distress, reputational harm, and other losses.

189.    Plaintiff is entitled to all remedies available under Va. Code Ann. § 2.2-3908, including compensatory and punitive damages, injunctive relief, and attorney's fees.

**Count 8:**
**Violation of the Virginia Human Rights Act**
**(Retaliatory Hostile Work Environment)**

190.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein, and particularly those allegations for the federal Title VII gender discrimination, and replaces the federal statue with the Virginia Human Rights Act, VA Code 2.2-3900, *et. seq.*

191.    Va. Code Ann. § 2.2-3905(B)(7) prohibits an employer from discriminating against an employee "because such individual has opposed any practice made an unlawful discriminatory practice by this chapter or … participated in any manner in an investigation …"

192.    By virtue of Plaintiff's protected activity in opposing unlawful discrimination, Defendants subjected her to retaliatory harassment that was sufficiently severe or pervasive to alter her working conditions and "adversely affect [her] status as an employee" (a. Code Ann. § 2.2-3905(B)(1)(b)), and )), and alter her terms, conditions, or privileges of employment, creating a hostile or abusive work environment.

193.    As a direct and proximate result of this retaliatory hostile work environment, Plaintiff suffered damages including, but not limited to, emotional distress, reputational harm, and economic losses.

194.    Plaintiff is entitled to all remedies available under Va. Code Ann. § 2.2-3908, including compensatory and punitive damages, injunctive relief, and attorney's fees.

**Count 9:**
**Violation of Equal Pay Act, 29 U.S.C. § 206(d), *et seq.***

33

195.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

196.    Vivian was paid at a rate less than the rate at which Defendants paid employees of the opposite sex in such establishment for equal work on jobs.

197.    Vivian, a female, was paid at a rate of $70,000 a year, but her predecessor of the same position who was a male was paid at a rate well over $100,000 a year.

198.    Both jobs required equal skill, effort, and responsibility, and which are performed under similar working conditions.

199.    Vivian was paid as such on the basis of her gender (female).

200.    As a direct and proximate result of the pay disparity, Vivian has suffered and continues to suffer damages, including past and future loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, emotional stress, inconvenience, embarrassment, and humiliation.

201.    Vivian is entitled to the compensatory unpaid wages, liquidated damages in an amount equal to the compensatory unpaid damages, and attorney fees, expenses and costs.

### Count 10:
### Violation of the Virginia Equal Pay Act Virginia Code §40.1-28.6 (the "VEPA"))

202.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein, and particularly those allegations for the federal Equal Pay Act violation, and replaces the federal statue with the Virginia Equal Pay Act Virginia Code §40.1-28.6 (the "VEPA")).

34

203. Defendants are employers within the meaning of the Virginia Equal Pay Act, Va. Code Ann. § 40.1-28.6, at all times relevant to this action.

204. Plaintiff is an employee within the meaning of the Virginia Equal Pay Act, Va. Code Ann. § 40.1-28.6, and has been employed by Defendants during the times alleged herein.

205. Va. Code Ann. § 40.1-28.6(A) provides in relevant part: "[n]o employer shall pay any employee at a rate less than the rate paid to employees of the opposite sex for work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any bona fide factor other than sex."

206. Defendants paid Plaintiff less than similarly situated male employees for work requiring equal or substantially similar skill, effort, and responsibility under similar working conditions.

207. No legitimate defenses under the Virginia Equal Pay Act (seniority system, merit system, productivity-based system, or a legitimate factor other than sex) explain or justify Defendants' pay practices.

208. By paying Plaintiff at a lower rate than her male counterparts, Defendants violated Va. Code Ann. § 40.1-28.6.

209. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer lost wages, benefits, and other damages.

210. Plaintiff is entitled to all remedies and relief provided by the Virginia Equal Pay Act and general Virginia law, including but not limited to back pay, liquidated/punitive damages if allowed, and reasonable attorneys' fees.

## Count 11:
## Violation of the Virginia Code § 40.1-27.3
## Prohibition against Retaliation

211. All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

212. Virginia law prohibits retaliation as follows:

An employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee:
1. Or a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official; …

Virginia Code § 40.1-27.3.

213. As set forth above, Vivian reported to her supervisors that the hiring and use of the Trainee violated the U.S. Immigration law and was retaliated against for the report by Defendants, including but not limited to firing, failing to promote, and changing benefits.

214. As such, Plaintiff is entitled to the back pay, front pay, compensatory damages for lost benefits, and attorney's fees and cost.

215. As such Vivian is entitled to compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

## Count 12:
## Intentional Infliction of Emotional Distress
## (against Sihoon)

216. All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

36

217.    As set forth above, Defendant Sihoon's conduct against Vivian was intentional or at least reckless, and extreme, outrageous and intolerable, and as a result of his conduct, Vivian suffered severe emotional distress, including seeing a psychiatrist.

218.    As such, Vivian is entitled to compensatory and punitive damages, and reasonable attorney's fees and cost.

### Count 13:
### Virginia Common Law Wrongful Discharge, *Bowman*, Claim

219.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

220.    As set forth above, Defendants discharged Vivian in violation of Virginia's public policy of prohibition against discrimination based on gender.

221.    As such, Vivian is entitled to compensatory and punitive damages, and reasonable attorney's fees and cost.

### Count 14:
### Vicarious Liability of KUSCO and NRF for Sihoon's Intentional Inflict of Emotional Distress, Gender Discrimination and Retaliation

222.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

223.    Defendant Sihoon is an employee of Defendants KUSCO and NRF.

224.    Defendant Sihoon was acting within the scope of his employment with Defendants KUSCO and NRF.

225.    Defendant Sihoon was engaged in conduct that was meant to be a benefit to the employer.

226.    As a result, Defendants KUSCO and NRF are vicariously liable to Defendant Sihoon's conduct of intentionally inflicting emotional distress, gender discrimination and retaliation.

227.    As such, Vivian is entitled to compensatory and punitive damages and reasonable attorney's fees and costs.

**Count 15:**
**Violation of FLSA**
**(Overtime)**

228.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

229.    Plaintiff worked overtime at least 100 hours in total. The exact record is not available to Plaintff but Defendants have it in their system.

230.    Plaintiff is entitled to overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 207.

231.    Defendants violated the provision of the Fair Labor Standards Act by failing and refusing in a willful and intentional manner to pay Plaintiff all overtime compensation due to her under the FLSA and its implementing regulations.

232.    Plaintiff has been damaged by the said violation by Defendants in an amount presently to be determined at the trial of this action.

233.    By reason of the aforesaid violations of the FLSA, Defendants are liable to Plaintiff in an amount equal to the unpaid overtime, which is at the rate of not-less-than one and one-half (1.5) times of Plaintiff's regular hourly wage rate, unpaid overtime penalties/liquidated

damages, all other applicable penalties and liquidated damages, attorney's fees and costs, and pre-and post-judgment interest.

## Count 16:
### Violation of VOWA
### (Overtime)

234.    All allegations of this Complaint are expressly incorporated herein and Plaintiff repeats and realleges each and every allegation set forth in this Complaint as though set forth fully at length herein.

235.    Plaintiff worked overtime at least 100 hours in total. The exact record is not available to Plaintff but Defendants have it in their system.

236.    Plaintiff is entitled to overtime pay under the Virginia Overtime Wage Act ("VOWA"), as Va. Code § 40.1-29.2 incorporates the Fair Labor Standards Act, 29 U.S.C. § 207.

237.    Defendants violated the provision of the VOWA by failing and refusing in a willful and intentional manner to pay Plaintiff all overtime compensation due to her under the VOWA and its implementing regulations.

238.    Plaintiff has been damaged by the said violation by Defendants in an amount presently to be determined at the trial of this action.

239.    By reason of the aforesaid violations of the VOWA, Defendants are liable to Plaintiff in an amount equal to the unpaid overtime, which is at the rate of not-less-than one and one-half (1.5) times of Plaintiff's regular hourly wage rate, unpaid overtime penalties/liquidated damages, all other applicable penalties and liquidated damages, attorney's fees and costs, and triple damages including the amount of wages due, and reasonable attorney's fees and cost, and pre-and post-judgment interest.

### Additional Allegations for Amended Complaint

240.    The number of employees of KUSCO is 15 or more as to Title VII; as to VHRA, between 6 and 14; and as to *Bowman* claim, between 2 and 5. The number of employees of NRF is 15 or more as to Title VII; as to VHRA, between 6 and 14; and as to *Bowman* claim, between 2 and 5. The number of employees of KIC is 15 or more as to Title VII; as to VHRA, between 6 and 14; and as to *Bowman* claim, between 2 and 5.

241.    It is not claimed that Ryu is an employer for the purpose of Title VII, or VHRA. It is claimed that Ryu is an employer for the purpose of FLSA, VOWA, VWPA, EPA, VA EPA, and § 40.1-27.3 counts, and if necessary IIED. No claim against Ryu is raised for Title VII, and VHRA. Further, no *Bowman* claim based on Title VII or VHRA is alleged against Ryu, but a *Bowman* claim based on § 40.1-27.3 is raised if he is not covered by the text of § 401.1-27.3.

242.    The work of some (of an unknown number but which will become evident through discovery) of NRF employees stationed in South Korea is directed to the control of labor relations and/or operation KUSCO. KIC is not a legally recognized entity but a division of KUSCO, which is controlled by NRF. As to KIC at Vienna location alone, 7 or 8 employees work for that division at all relevant times. As such, KUSCO, which has KIC as a division, and has all those 7 or 8 employees on KUSCO's payroll and supervises the labor relations of KIC has at least 7 or 8 employees. KUSCO has additional two full time employees in the U.S. at all relevant times. As such, KUSCO's employees reach to 9 or 10 employees. Further, KUSCO controls or at least supervises another operation in CA, which is similar to KIC, KUSCO's DC operation. NRF sends their president the top officer of NRF as the president the top officer of KUSCO, and sends their investigation team to personally investigate labor disputes and has employees stationed in South Korea monitoring KIC and KUSCO's labor relations in the U.S.

Some of the employees are likely to be U.S. citizens or at least Permanent Resident Aliens (i.e., so called Green Card holders).

243.    As such, depending on how the number of employees is counted and allocated among KIC in DC, another operation in CA, KUSCO, and NRF, as determined (and may still be disputed) after discovery, the applicability of Title VII, VHRA and *Bowman* claim based on the numerosity will be determined. The above alternative allegations are made for the purpose of notice pleading pursuant to FRCP Rule 8(e)(2).

244.    As to Vivian's comparator for the purpose of EPA and gender discrimination and their Virginia state counterparts, a comparator is the previous male Director, who held the same title. The job duties and work performed are the same or at least substantially equal between the comparator and the victim plaintiff Vivian as to skills, efforts and responsibilities as set forth above. Further, the following new comparators became available after the filing of the complaint.

245.    After Vivian was unfairly, unlawfully, illegally, discriminatorily and unequally ousted or terminated, someone was hired as a manager, and she was paid the manager level salary. That new manager was at one point assigned to a task that Vivian used to take care of. The new manager reported that she could not do the work because she did not know what to do and just copied Vivian's work and submitted it to NRF for review and approval. She eventually left the defendants.

246.    After she quit, a former employee, who was only a manager, Ms. Ahn, was contacted by Ms. Han and was invited to come back to do what Vivian used to do. Ms. Ahn was even told that the defendants would pay her whatever she wanted, but Ms. Ahn declined that invitation because she never did what Vivian used to and did not think she was able to do what Vivian used to do.

247.    Eventually, the defendants placed a job posting, where the title was Director, and the offered salary was $80,000~$100,000 for the job duties that are the same or at least substantially equal to what Vivian used to do.

248.    As such, the circumstances and comparators show that Vivian's job duties or work was the same or substantially equal to what the predecessor male Director did, and not something of what a manager could do, but was paid substantially lower than what should have been paid for a Director if she was paid gender neutrally, what the former Director was paid or what the new job posting for the Director offered. Further, based on the workplace atmosphere of publicly requiring without hesitation female employees to be a foxy lady, a traditional gender role, and the disparate discriminatory disadvantages imposed on Vivian while those perks and career opportunities available to even lower level (i.e., managerial) male employees by denying the same perks and career opportunities, it is evident that Vivian was discriminated based on her sex, i.e., female.

249.    As to Vivian's performance, as shown above, she was amply qualified and aced in her performance. Although "satisfactory performance" has never been an element of Title VII and VHRA claims, as much as it will obviate the defendants assertion that that has to be pled, Vivian states here that her performance was above and beyond objective standards for satisfactory performance as in paragraph 104 it was set forth that "Performance evaluations by the participants of her program were the best in KIC's history." And in paragraph 108, despite the roadblocks, she "achieved a new KIC record of successfully developing new partner institutions in the U.S." and "successfully completed her program."

250.    Although Vivian did not specifically used the wording gender discrimination or sex discrimination in her internal complaints, the defendants would and should have reasonably

understood that the substance of her complaints encompasses gender or sex discrimination, and she was engaged in the protected activity and the employers, defendants, should have controlled Sihoon not to engaged in retaliatory conducts.

251. NRF funds KIC via an annual grant of approximately ₩10 billion (roughly USD $7–8 million), which covers personnel, programming, rent, and overhead. NRF hires and fires and controls the head of KIC, the head of KUSCO and the manager of KUSCO, and directs the labor relation of KIC and KUSCO. NRF calls KUSCO NRF's US office, and KIC a division of KUSCO.

252. KIC has no independent legal identity or banking infrastructure. It is an unincorporated association, operating entirely on KUSCO's authority. All wages, including those paid to Plaintiff, came out of KUSCO's payroll.

253. NRF exercises direct and ongoing control over KUSCO and KIC. NRF employees—primarily its Liaison Officer, Dr. Jung Her—maintain physical presence in Virginia and routinely intervenes in KIC's internal staffing, budgeting, and performance issues.

254. NRF evaluates KIC's performance annually and determines the next year's funding. These performance reviews are based not on sovereign diplomatic metrics, but on KIC's success in delivering commercial outcomes such as startup support, investment matching, and program participants' evaluation.

255. NRF has also been involved in post-hiring audits and investigations into KIC's management practices and labor relations.

256. NRF directs KIC to design and execute programs that help Korean startups enter the U.S. market by facilitating investment, forming commercial partnerships, and enabling technology transfer as venture capitals ("VC") do. In fact, the reason why Sihoon was hired is his

alleged successful VC experience, not as a diplomat or government employee. Sihoon used to work for an investment arm of a large Korean telecommunication company's U.S. office. KIC also in part acts as if a travel agency providing reservation services for hotels and transportation and site visiting schedules and arrangements, and providing networking opportunities with professionals such as lawyers, venture capitalists and technology field leaders. In fact, Ms. Ahn's background was hotel industry, and she had a master's degree in tourism from one of the respected women's college in South Korea.

257.    NRF-authorized programs are funded by a hybrid of NRF grant and program participation fee charged on participants. KIC charges each participant several hundred dollars per program.

258.    Plaintiff personally negotiated and executed a facility rental agreement with George Washington University at a discounted rate, enabling KIC to operate with greater financial efficiency.

259.    Although Plaintiff was nominally hired by KIC and legally by KUSCO, Plaintiff constantly collaborated with NRF.

260.    NRF personnel evaluated KIC's performance and directly involved itself in supervisory decisions affecting Vivian's labor disputes and complaints as well as those of other KIC/KUSCO employees. When Plaintiff raised internal complaints about budget irregularities and discrimination to KUSCO (Mr. Her), NRF officials were notified and actively organized and conducted an on-site investigation of her complaints. NRF even recorded interviews with employees during the on-site investigation.

261.    Ultimately, Plaintiff's termination followed management disputes in which NRF personnel played an active role, in fact, encouraging Sihoon's retaliatory and discriminatory

conducts by refusing to take any real measures other than just going through the motions. NRF even instructed KIC to revise its employee handbook and report it to NRF.

262.    NRF and KIC/KUSCO shared centralized control over labor relations. NRF's Liaison Officer (Mr. Her) and NRF staff members stationed in South Korea acted in an oversight capacity equivalent to an executive in a parent-subsidiary relationship.

263.    Internal meetings and co-branded materials including but without limited to large back drop banners for photo shoot sessions of the participants routinely used by Plaintiff reflect the integrated nature of the two entities. KIC's staff operated under policies created or approved by NRF and could not carry out key decisions without NRF's consent.

264.    For these reasons, Plaintiff alleges that NRF and KIC/KUSCO operated as an integrated or single employer within the meaning of Title VII, VHRA, EPA, VA EPA, FLSA, VOWA (VWPA) and § 40.1-27.3.

265.    As set forth above, Sihoon intentionally inflicted emotional distress on Vivian by creating a sexist workplace environment where sexualist statements such as "be a foxy lady" was commonly uttered by a managerial employee, actively sabotaging her career, extending her probation as retaliation, repeated public humiliations which extended over six months of near-daily pattern of abuse, direct abusive exertion of managerial authority directed to mentally torment her and crush the victim Vivian's spirit including but not limited to blocking networking, cutting pay, forcing to consent to employee handbook changes, controlling communications, ignoring her legitimate requests, and as a result, distressing the victim Vivian to suffer medically significant conditions, including but not limited to weight loss, insomnia, inability to eat or sleep, fainting during a blood draw, and ongoing psychiatric treatment.

266.    Further, Sihoon's outrageous conduct includes defiantly threatening and explicitly intimidating the victim Vivian with statements he would not be disciplined despite the victim Vivian's internal complaint and on-site labor relation audit, and if you take next step, people above would not like it coupled with defamation to third parties (GWU). This was not just a typical workplace labor dispute. The day to day abuse and intimidation with the threat of sabotaging her career, which is not only her livelihood but the achievement for which she invested considerable time and money, i.e., coming to the U.S. from South Korea, attending an expensive MBA program (GWU) and at least 3 years of her life, coupled with coercing her to surrender by showing subservient and even flirtatious outdated stereotypical gender behavior was in no way something that should have been tolerated in a civilized community of year 2024. It was atrocious and utterly intolerable and goes beyond all possible bounds of "decency" of year 2024.

267.    Further, as set forth above, Sihoon and his lieutenant Song Hee Han's explicit, pervasive discriminatory conduct, exclusion, and insults in the context of the sexist remark (be a foxy lady) that coerced her to show female appeasement behavior to acknowledge a dominant male by being a foxy lady coupled with Han's own morning fruit tray delivery to Sihoon was creating sexually hostile work environment. The temporal proximity and escalated retaliatory conduct after NRF's engagement shows that hostile work environment was also a result of retaliation. For example, Sihoon granted Vivian access to other employees' Google Drive and Gmails so that she could look up old documents for her work in the beginning. However, around April 2024 after her complaint to Mr. Her, Sihoon changed the passwords and eventually later accused Vivian of unlawfully accessing co-workers' emails.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.    As to Counts 1-4, an award of $350,000 for compensatory and punitive damages, and additional reasonable attorney's fees and cost against Defendants jointly and severally;

b.    As to Counts 5-8, 12-13, an award of $350,000 for punitive damages, $350,000 for compensatory damages, and additional reasonable attorney's fees and cost against Defendants jointly and severally;

c.    As to Counts 9-10, an award of at least $30,000 with additional reasonable attorney's fees and cost against Defendants jointly and severally;

d.    As to Counts 11, an award of at least $10,000 with additional reasonable attorney's fees and cost against Defendants jointly and severally;

e.    As to Counts 14-15, an award of at least $12,000 for unpaid overtime, liquidated damages, and triple damages, and additional reasonable attorney's fees and cost against Defendants jointly and severally; and

f.    awarding Plaintiffs further relief deemed just and equitable by this Honorable Court.

### Ad Damnum Clause

Plaintiff for the purpose of Ad Damnum clause as much as required states the damages sought including all kinds of damages including but not limited to compensatory, and punitive damages is $2,000,000.00.

### REQUEST FOR JURY TRIAL

Plaintiff requests that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

By Hyuna Lee aka Vivian Lee,

Through her counsel:

<u>/s/(Michael) Hyunkweon Ryu</u>
(Michael) Hyunkweon Ryu
Ryu & Ryu, PLC
Attorney for Plaintiffs
301 Maple Ave West
Suite 620
Vienna VA 22180