IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

HYUNA LEE,                          )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Civil Action No. 1:25-cv-635 (RDA/WEF)
                                    )
KOREA INNOVATION CENTER,            )
*et al.*,                           )
                                    )
        Defendants.                 )

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendants' Motions to Dismiss (Dkts. 17, 20, 23, 26). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter is fully briefed and ripe for disposition. Considering the Amended Complaint (Dkt. 15), Defendants' Memoranda in Support (Dkts. 18, 21, 24, 27), Plaintiff's Oppositions (Dkts. 31, 32, 33, 34), Defendants' Replies (Dkts. 35, 36, 37), and Plaintiff's Sur-Reply (Dkt. 38),[1] this Court GRANTS Defendant National Research Foundation of Korea's Motion to Dismiss (Dkt. 20), GRANTS-IN-PART and DENIES-IN-PART Defendant Korea Innovation Center's Motion (Dkt. 23), GRANTS-IN-PART and DENIES-IN-PART Defendant Korea-U.S. Science Cooperation Center's Motion (Dkt. 26), and GRANTS-IN-PART and DENIES-IN-PART Defendant Sihoon Ryu's Motion (Dkt. 17) for the reasons that follow.

---

[1] The Court previously granted the Motion for Leave to File a Sur-Reply. Dkt. 41.

1

## I. BACKGROUND

### A. Factual Background[2]

Plaintiff Hyuna Lee, also known as Vivian Lee, has filed the instant case against Defendants Korea Innovation Center ("KIC"), Korea-U.S. Science Cooperation Center ("KUSCO"), National Research Foundation of Korea ("NRF"), and Sihoon Ryu ("Sihoon"). Dkt. 15 ¶ 1.

KIC operates "Technology Exchange & Transfer" programs approved by NRF, and other Korean government-funded organizations, such as the Commercialization Promotion Agency for R&D Outcome ("COMPA"). *Id.* ¶ 43. KIC's programs are designed to support the commercialization of the participants' technologies and promote entrepreneurship of the participants, usually, technology start-ups. *Id.* ¶ 45. The funding organization (such as NRF or COMPA) selects the institutional participants, who are usually Korean start-up companies or universities. *Id.* ¶ 46. The institutional participants send individuals to the United States to participate in the program. *Id.* ¶ 47. Most KIC programs consist of four to ten half-day online sessions. *Id.* ¶ 48.

KIC also operates in-person three-week programs in the United States, inviting individuals from institutional participants in Korea to the United States. *Id.* ¶ 49. These programs host individual participants in various locations in the United States, primarily in Washington, D.C. (more specifically located in Vienna, Virginia), and Silicon Valley. *Id.* ¶ 50. These relatively long-term programs involve hosting the individual participants, including booking hotels, planning field trips to technology companies, arranging seminars for networking with U.S. professionals,

---

[2] For purposes of considering the Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

collaborating with the educational institutions, and monitoring the individuals' level of participation. *Id.* ¶ 53.

Mostly Directors and sometimes Senior (Program) Managers handle the long-term programs, and Senior Managers and (non-senior) Managers handle the rest of the programs—which are mostly online programs. *Id.* ¶ 54. Directors also supervise Senior Managers and (non-senior) Managers for the programs they handle. *Id.* ¶ 55. Directors develop new programs per the client's (*e.g.*, NRF, COMPA) specifications. *Id.* ¶ 56. Directors also act as the main point of contact for KIC's regional programs, including KICDC. *Id.* ¶ 57. And Directors organize and host an annual Demo Day. *Id.* ¶ 58.

From June 2022 until April 2023, Plaintiff worked as an M.B.A. project management intern for KIC. *Id.* ¶ 39. After obtaining her M.B.A. degree from The George Washington University ("GW") in May 2023, Plaintiff was hired by an investment company as the Director of Investor Relations from June 2023 until she again started working for KIC as a Director. *Id.* ¶ 40. Plaintiff took a substantial pay cut to work for KIC. *Id.* ¶ 42.

Plaintiff's predecessor was Yong Bum Kim, a man. *Id.* ¶ 59. Plaintiff alleges that her predecessor's and her work are equal, requiring equal skill, effort, and responsibility, performed in the same office and in the same neighboring areas such as Washington, D.C., and Northern Virginia. *Id.* ¶ 62. However, Plaintiff alleges that she, a female employee, was paid substantially less than her male predecessor. *Id.* ¶ 64. Plaintiff was paid $70,000 a year, while her predecessor was paid more than $100,000 a year. *Id.* KIC also pays a male Trainee $70,000 a year, and paid Deputy Directors over $80,000 a year. *Id.* ¶ 64.

Plaintiff's male predecessor received the following support for his work as Director: (1) KIC authorized and paid for him several speakers/guest lecturers and outside advisors, (2) KIC,

3

per its employee handbook, provided career development support ($5,000 a year), and (3) KIC authorized and paid fees for participating in various industry trade events, such as SelectUSA Investment Summit and Bio International Convention, and meetings. *Id.*

When Plaintiff was hired as a Director, KIC also hired Hyung Jin Yoon (a male) as a Senior Manager. *Id.* ¶ 60. In June 2024, KIC hired Sewon Lee (a male) as a Trainee. *Id.* ¶ 61. Plaintiff asserts that KIC also pays participation fees for them. *Id.* ¶ 66. When the Senior Manager (male) so requests, KIC pays $300 per 1 hour presentation for outside lecturers. *Id.* ¶ 67. Sihoon, the president of KIC, also invites them to various network opportunities. *Id.* ¶¶ 68, 70. KIC allegedly refuses to provide such support to Plaintiff. *Id.* ¶ 69.

Plaintiff also alleges that Sihoon intentionally excluded Plaintiff from meetings and networking dinners with Plaintiff's program participants, and when Plaintiff raised that issue, he told her, "It's not even your program, why are you so interested? Mind your own business." *Id.* Plaintiff further alleges that Sihoon intentionally undermined Plaintiff's authority to supervise and discipline the Trainee (male) by encouraging and even supporting his insubordination and treated her as if she was at the bottom of the chain of command or authority at KIC even though she was right below Sihoon, and higher than everyone else at KIC. *Id.* For example, when Plaintiff complained to Sihoon that the Trainee (male) refused to follow her instructions and guidance, Sihoon ignored her, and often intentionally undermined Plaintiff's authority as Director by publicly telling the Trainee to do what he wants no matter what Plaintiff says. *Id.*

Songhee Han (female) is the Operations Manager of KIC. *Id.* ¶ 71. She told multiple female employees at KIC, including but not limited to Plaintiff, that, "Sihoon likes foxy ladies, so you should behave like a foxy lady." *Id.* Songhee was then invited to and did participate in networking dinners, even though the Operations Manager is not typically included. *Id.* ¶ 72. On

the other hand, although Directors typically participate in such dinners, and even Managers were invited to such dinners, Sihoon excluded Plaintiff from such networking dinners. *Id.* Sihoon even invited the Trainee (male), but he intentionally excluded Plaintiff, thereby taking away her networking opportunities. *Id.*

Sihoon also publicly criticized Plaintiff for coming to work a little late, which was not due to tardiness but work-related reasons, including meeting with a KIC client. *Id.* ¶ 73. Sihoon never says anything publicly when male employees (Manager and Trainee) come to work late or even do not come to work. *Id.* Sihoon scolded Plaintiff for working after 5:30 p.m., accusing her of unnecessarily incurring overtime when she adjusted her work schedule to collaborate with a person in a different time zone for a program. *Id.* However, Plaintiff alleges that Sihoon does not say anything about Senior Managers (males) working beyond 5:30 p.m., including evening dinner meetings with local people paid for by KIC. *Id.* Plaintiff also alleges that Sihoon did not publicly say anything to the Trainee who intentionally disappeared from a program meeting that Plaintiff was in charge of and humiliated her by publicly dismissing her request for discipline of the Trainee. *Id.*

Sihoon instructed Plaintiff not to communicate with her predecessor or other KIC former employees despite needing to ask questions about her work because she did not have sufficient time to take over her predecessor's job at KIC. *Id.* ¶ 74. On the other hand, Plaintiff alleges that Sihoon permits Senior Managers (males) to communicate with former employees freely. *Id.* On the other hand, Plaintiff alleges that Sihoon also criticized her for not contacting those same predecessors and accused her of lacking communication skills. *Id.*

Sihoon also instructed KIC employees not to use Kakao Talk—one of Korea's preferred forms of communication in business settings—for KIC's work. *Id.* ¶ 75. Although COMPA and

program participants such as universities wanted to communicate through Kakao Talk with Plaintiff, she told them to communicate by emails due to Sihoon's instruction. *Id.* As a result, they complained about her for not using Kakao Talk, and Sihoon then accused Plaintiff of having poor communication skills and painted her as strange. *Id.* But when Plaintiff used Kakao Talk because of such complaints, Sihoon criticized her for being informal with her work and for not following her superior's instructions. Plaintiff alleges that Sihoon did not similarly criticize or discipline Senior Managers (male) for using Kakao Talk but permitted them to use it freely. *Id.*

Sihoon also rebuked and publicly humiliated Plaintiff for GW's refusal to use the application DocuSign. *Id.* ¶ 76. However, both Sihoon and Plaintiff had received prior notices from GW that they would not use DocuSign due to security concerns. *Id.*

After Sihoon raised issues regarding complaints from GW regarding Plaintiff's communication skills and GW's unwillingness to contract with KIC, Plaintiff met with GW employees per NRF's instruction. *Id.* ¶ 77. An employee confirmed that GW did raise communication issues, but it was for a different KIC employee. *Id.* The GW employee said that Plaintiff was doing a great job and clarified to Sihoon that they were not concerned with Plaintiff's communication skills. *Id.* A different employee confirmed that GW never told KIC that they would not contract with KIC and confirmed that he explained that to Sihoon in person. *Id.*

When Plaintiff complained about the inconsistent and disparate treatment by Sihoon, he criticized her as overreacting and aggressive. *Id.* ¶ 78. Sihoon never accused any male employees of being aggressive. *Id.* Plaintiff alleges that Sihoon called other female employees aggressive as well when they complained to him. *Id.*

Plaintiff also alleges that Sihoon also scrutinized Plaintiff's work to pick on her. *Id.* ¶ 79. For example, Sihoon demanded that Plaintiff explain why an intern was hired, even though the

proper procedures had been followed and he had approved the hiring.  *Id.*  Sihoon never did that to male employees.  *Id.*

At another point in time, Sihoon demanded that Plaintiff hire an intern contrary to the hiring procedure.  *Id.* ¶ 82.  Plaintiff explained the irregularity and indicated that she would follow the proper procedure, but Sihoon was furious.  *Id.*  At another time, Plaintiff alleged that the current individual in the KIC Trainee position is in violation of U.S. immigration law and KIC's policy, but Sihoon refused to correct it.  *Id.*  Sihoon got angry and encouraged the Trainee (male) to ignore Plaintiff and humiliated Plaintiff in front of her subordinate.  *Id.*

Plaintiff also organized a networking meeting for her program's participants with a DC law firm; however, when Plaintiff was not there, Sihoon spoke badly of her and said that the meeting was a complete waste of time and useless.  *Id.* ¶ 80.  Sihoon did not even come to the meeting, so he did not even have any personal knowledge of what happened in the meeting.  *Id.*

Such treatment, including Sihoon's statements about her work performance, took a toll on Plaintiff's emotions and her reputation.  *Id.* ¶ 81.  She was so emotionally distressed that she had to seek medical care, and she is currently under the care of doctors to overcome the emotional distress intentionally inflicted upon her by Sihoon.  *Id.*

On April 5, 2024, Plaintiff reported to Mr. Her/Huh of KUSCO Sihoon's pressure to hire the intern and his allegedly abusive, harassing, defamatory, discriminatory, and retaliatory conduct against her.  *Id.* ¶ 83.  Subsequently, on April 10, 2024, NRF conducted a Zoom meeting with Sihoon.  *Id.*  NRF instructed Sihoon to conduct one-on-one meetings with all employees to hear their complaints and report back to NRF.  *Id.*  Sihoon refused to hold one-on-one meetings but held meetings with each employee with Songhee present.  *Id.*

Plaintiff alleges that, initially, Sihoon thought the complaint was made by another female employee who left KIC and he retaliated against her. *Id.* ¶ 84. He swore that he would not leave her alone. *Id.*

Sihoon held a meeting with Plaintiff on April 15, 2024. *Id.* ¶ 85. Plaintiff met with Sihoon and Songhee to tell them about the abusive and discriminatory treatment and request changes. *Id.* Sihoon told Plaintiff that he knew that Plaintiff had made the complaint and told her to tell him to whom at NRF she made the complaint and the reason why she made the complaint to KUSCO. *Id.* Sihoon ridiculed Plaintiff, saying that neither NRF nor KUSCO could discipline him. *Id.* Songhee consistently talked over Plaintiff to block her from talking to Sihoon. *Id.* During the meeting, Sihoon looked outside the window and would state nonchalantly that it was hailing outside, how he never had hail when he was in California, and he hoped that his car did not get damaged by the hail. *Id.* Plaintiff asserts that Sihoon wanted to show that he was not interested in talking to her or concerned about her complaint. *Id.* Sihoon also told Plaintiff that NRF told him that the investigations were only for the sake of going through the motions, that her complaint would not do any harm to him, that he had experienced this type of labor relations trouble many times, and that this kind of complaint would not do any harm to him. *Id.* Plaintiff reported Sihoon's recalcitrant statements to Her/Huh of KUSCO because she could not believe that NRF really told him so. *Id.* Her/Huh denied such statements by NRF. *Id.* After the meeting, Sihoon behaved as if nothing happened, showing his complete disregard of Plaintiff. *Id.*

Right after the meeting, Sihoon sent an email containing his excuses and self-serving statements, laying the groundwork to terminate Plaintiff in retaliation for her complaints. *Id.* ¶ 87. After the meeting, Plaintiff found it difficult to believe that NRF and KUSCO were taking proper measures to protect her because she alleges that (1) Her/Huh texted her that Sihoon told him that

8

everything was resolved, even though this was not true, (2) nothing was done to remedy the situation, and (3) the harassing and discriminatory conduct did not stop but merely became subtle. *Id.* ¶ 88.  As such, on or about April 26, 2024, Plaintiff drafted a written complaint and sent it to Her/Huh to be reported to NRF and the Korean government's Ministry of Science and ICT,[3] which she believed would do justice.  *Id.* ¶ 89.  Her/Huh asked if he could share Plaintiff's complaint with Sihoon, and Plaintiff agreed.  *Id.*

NRF decided to conduct an on-site internal investigation, which was scheduled for May 2024. *Id.* ¶ 90.  Sihoon learned about the internal investigation.  *Id.*  After that, Sihoon wanted to have another meeting with Plaintiff.  *Id.*  She demanded for it to be recorded, but Sihoon refused. *Id.*  He insisted on meeting her without a recording.  *Id.*

On April 29, 2024, Sihoon and Plaintiff met with Her/Huh, and Plaintiff recorded the meeting after notifying the other parties.  *Id.*  At the April 29, 2024 meeting, Sihoon for the first time learned that Plaintiff's complaint was reported to the Ministry of Science and ICT as well. *Id.* ¶ 91.  Sihoon got very angry.  *Id.*  Plaintiff demanded Sihoon write an apology, but he refused to do so and denied everything.  *Id.* ¶ 92.

Right after the meeting, Sihoon interrupted Plaintiff and Her/Huh's conversation in the hallway and told Plaintiff that he would extend her probationary period.  *Id.* ¶ 93.  The next day he sent a letter justifying his decision with self-serving pretextual statements.  *Id.*  Plaintiff was not paid proper benefits with the excuse that she was still in the trial period.  *Id.* ¶ 94.  However, the original employee handbook did not say anything about the extension of the trial period and entitled her to various benefits after the completion of the first 90 days of employment.  *Id.*

---

[3] The official English name of the ministry is the "Ministry of Science and ICT."  "ICT" stands for "Information and Communication Technology."

Plaintiff asserts that no male employees received such an extension, and Plaintiff's performance evaluations by the participants in her program were the best in KIC's history. *Id.* ¶ 104. Around this time, Sihoon also told at least one KIC employee that he would fire Plaintiff after her program ended in July. *Id.* ¶ 100.

In May 2024, the NRF on-site internal investigation team interviewed and recorded the testimonies of current and former employees. *Id.* ¶ 95. The recorded testimonies include Plaintiff's testimony that she heard from a former employee that Sihoon threatened that former employee (female) unless she brought Sihoon evidence to justify the termination of Plaintiff, and Her/Huh's testimony that he heard the same from the same former employee. *Id.* Both Plaintiff and Her/Huh testified that the employee who was threatened had a recording of that threat. *Id.* During this ordeal, Plaintiff suffered emotionally and physically, and she lost weight, could not sleep or eat, and, on April 30, 2024, even fainted while having blood drawn at a hospital. *Id.* ¶ 96.

NRF made the following findings: (1) NRF found that Sihoon's remarks to Plaintiff regarding her complaints  sounded threatening or hostile to her and could constitute unlawful harassment, *id.* ¶ 97; (2) NRF found that Sihoon had the managerial authority to set Plaintiff's pay rate and change her job responsibility, such that  Sihoon did not discriminate between Plaintiff and other employees, *id.*; and (3) NRF found that Sihoon's conduct of unfairly hiring employees violated policies regarding equal opportunity in employment. *Id.*

NRF also required Sihoon to take the following corrective measures: (1) prevent the recurrence of unlawful harassment (stating NRF would revisit the issue in three months), (2) complete training on the prevention of unlawful harassment, and (3) complete training on leadership and ethics in research. *Id.* ¶ 98. Despite this, Plaintiff alleges that Sihoon did not take the required training. *Id.* ¶ 105. Plaintiff further alleges that he also subsequently scrutinized

Plaintiff's communications and appears to have monitored her computer access, wrongfully accused her of attempting to access other employees' personnel files, withheld all support, subjected her to an exceptionally unfairly massive workload, undermined and humiliated her, and encouraged her subordinates to be insubordinate to her, and falsely accused her of poor communication skills. *Id.*

After the NRF investigation, Her/Huh told Plaintiff that they took remedial measures, but he told her, "American lawyers make things complicated and I am telling you for your benefit that if you take the next step the people above would not like it." *Id.* ¶ 101. NRF also told Plaintiff that they gave Sihoon three months to improve and they would watch him, and told her, "We spoke with lawyers and they are split half and half as to whether it would be worth [it] for you to bring a suit for these issues, and as such, you should make a good judgment." *Id.*

Plaintiff alleges that KUSCO and NRF did not take any measures to stop Sihoon from continuing his discriminatory practices, including discriminatory pay and extension of the trial period. *Id.* ¶ 102. When Plaintiff asked for compensation for harassment in the workplace and unfair disparate treatment, they told her that they did not have such provisions. *Id.*

Sihoon's conduct inflicted tremendous emotional distress on Plaintiff. *Id.* ¶ 106. She is seeing several health professionals as a result, and her family life has been negatively affected from the stress. *Id.* Sihoon's conduct disrupted her work, making it extremely difficult for her to work normally and substantially hampering her career development. *Id.* ¶ 107. Still, Plaintiff achieved a new KIC record of successfully developing new partner institutions in the United States and she successfully completed her program. *Id.* ¶ 108.

On July 26, 2024, KIC created a new employee handbook that was changed substantially from the original. *Id.* ¶ 109. The new handbook changed the trial period from 90 days to 90-180

days, and substantially reduced the reference to retaliation. *Id.* Songhee ordered Plaintiff to sign the new handbook, but Plaintiff refused. *Id.*

On August 5, 2024, Plaintiff had a debriefing session for her program with the participating institutions and the Ministry of Science and ICT, a ministry of the Korean government that funds COMPA, which the program that Plaintiff managed. *Id.* ¶ 110. During that session, an issue of the conduct of a group of participants during the program surfaced, and Plaintiff reported it truthfully. *Id.* ¶ 111. Plaintiff, as the one in charge of the program, wanted to handle the conduct with understanding that they were still young college kids but also according to the rules and regulations relating to the funding so that the future participants would not repeat the same mistake. *Id.* Sihoon wanted to cover up the issue, however, and he initially did. *Id.* ¶ 112. But when it came up during the session, Plaintiff answered truthfully. *Id.*

On August 13, 2024, while in a meeting with COMPA, it appeared that Sihoon learned about the August 5, 2024 meeting. *Id.* ¶ 113. On August 27, 2024, Sihoon fired Plaintiff. *Id.*

On August 27, 2024, immediately following the termination letter, KIC sent Plaintiff an agreement, calling it a separation agreement and claiming that it was to "help ease [her] transition," even though it included a release of claims. *Id.* ¶ 114. KIC conditioned a severance payment of $5,833.33 on signing the agreement. *Id.* In fact, the document was a settlement agreement, and the first section was titled "Non-Admission of Liability" of the employer. *Id.*

### B.   Procedural Background

On March 7, 2025, Plaintiff filed a Complaint in the Circuit Court of Fairfax County, Virginia. Dkt. 1-1. On April 15, 2025, the case was removed to this Court. Dkt. 1. On May 6, 2025, Plaintiff filed an Amended Complaint. Dkt. 15.

On May 20, 2025, Defendants each filed a separate Motion to Dismiss. Dkts. 17, 20, 23, 26. On June 17, 2025, Plaintiff filed her Oppositions. Dkts. 31, 32, 33, 34. On June 27, 2025, Defendants filed Replies. Dkts. 35, 36, 37. On July 2, 2025, Plaintiff filed her Sur-Reply. Dkt. 40.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the Court lacks jurisdiction over the subject matter of the action. A district court must dismiss an action over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3). In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that subject-matter jurisdiction is proper. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

There are two ways in which a defendant may prevail on a 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based." *Adams*, 697 F.2d at 1219. Under this method of attack, all facts as alleged by the plaintiff are assumed to be true. *Id.* Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject-matter jurisdiction over the case apart from the pleadings. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). In such a case, "[n]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.3d 884, 891 (3d Cir. 1977).

## B. Rule 12(b)(6) Standard

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III. ANALYSIS

In her Amended Complaint, Plaintiff asserts sixteen claims: (1) Gender Discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), (2) Title VII Retaliation, (3) Title VII Hostile Work Environment, (4) Title VII Retaliatory Hostile Work Environment, (5) Gender

Discrimination under the Virginia Human Rights Act ("VHRA"), (6) VHRA Retaliation, (7) VHRA Hostile Work Environment, (8) VHRA Retaliatory Hostile Work Environment, (9) a violation of the Equal Pay Act ("EPA"), (10) a violation of the Virginia Equal Pay Act ("VEPA"), (11) a violation of the Virginia Whistleblower Protection Act ("VWPA"), (12) Intentional Infliction of Emotional Distress ("IIED") (against Sihoon), (13) Virginia Common Law Wrongful Discharge (a *Bowman* Claim),[4] (14) Vicarious Liability of KUSCO and NRF, (15) a violation of the Fair Labor Standards Act's ("FLSA") overtime provisions, and (16) a violation of the Virginia Overtime Wage Act ("VOWA"). Dkt. 15. In the Motions to Dismiss, Defendants make several arguments. The Court will first address NRF's immunity argument and then will address the remaining arguments by Count.

A. Foreign Sovereign Immunities Act ("FSIA")

In its Motion, NRF argues that this Court lacks subject matter jurisdiction over it because it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. Dkt. 21 at 4. Because NRF is an agency or instrumentality of the Korean government that was not engaging in exempt commercial activity, the Court agrees.

The FSIA "entitles foreign states to immunity from the jurisdiction of courts in the United States subject to certain enumerated exceptions." *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993) (citation omitted). The FSIA defines "foreign state" to include an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "An 'agency or instrumentality of a foreign state' means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose

---

[4] A "*Bowman* Claim" is premised on the Supreme Court of Virginia's decision in *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985), in which the Supreme Court of Virginia recognized a narrow public-policy based exception to the general rule of at-will employment.

shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b).

NRF argues that it is an agency or instrumentality of the Republic of Korea.  Dkt. 21 at 5. NRF is a statutorily created independent agency of the Republic of Korea established under the NRF Act.  Dkt. 37-1 ¶ 5 (Her Decl.); Dkt. 15 ¶ 18.  The purpose of the NRF Act is "to support the academic and research and development activities, and development and utilization of related human resources, etc. more efficiently and fairly by establishing the National Research Foundation of Korea."  Dkt. 37-1 ¶ 6; *id.* at 5 (NRF Act).  NRF receives 100% of its funding through the Republic of Korea, primarily through the Ministry of Science and ICT and the Ministry of Education.  *Id.* ¶ 7; Dkt. 15 ¶ 16.  NRF must receive authorization from the Ministry of Science and ICT to amend its articles of association.  Dkt. 37-1 ¶ 8; *id.* at 6.  NRF is required annually to prepare a written statement of accounts and provide it to the Ministry of Science and ICT for approval.  *Id.* ¶ 9; *id.* at 10.  The Ministry of Education and the Ministry of Science and ICT have the authority to retain subordinate public officials to inspect the status of affairs, accounts and assts of the NRF or to order the NRF to submit necessary data.  *Id.* ¶ 10; *id.* at 10.

Here, Plaintiff does not dispute that NRF qualifies as a "foreign state" under the FSIA. Accordingly, the Court proceeds to analyze whether an exception to immunity applies.  *See Gerding v. Republic of France*, 943 F.2d 521, 526 (4th Cir. 1991) ("Once a party demonstrates to the district court that it is a 'foreign state' potentially entitled to immunity under the FSIA, the burden shifts to the opposing party to raise the exceptions to sovereign immunity and assert at least some facts that would establish the exceptions." (quoting *Stena Rederi AB v. Comision de Contratos del Comite,* 923 F.2d 380, 390 n.14 (5th Cir.1991))).

Plaintiff argues that an exception to NRF's immunity applies in this case because "the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* "[A] state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360, (1993) (cleaned up). "Put differently, a foreign state engages in commercial activity . . . only where it acts in the manner of a private player within the market." *Id.* "Thus, when the sovereign engages in a transaction peculiar to sovereigns—one in which private parties cannot engage—it is engaged in *sovereign activity* that is not excepted from the immunity conferred by the FSIA, even if it involves the purchase of goods." *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 294 (4th Cir. 2022) (emphasis original).

Here, Plaintiff relies on her allegations that "NRF funds KUSCO/KIC, sets salaries, supervises programs, and conducts venture-accelerator and travel itinerary services in Virginia." Dkt. 38 at 4. As a preliminary matter, NRF has submitted evidence that NRF does not actually fund KUSCO or KIC. Dkt. 37-2 ¶ 3. In response, Plaintiff submitted a job posting by NRF for the position of "Chief of KIC-Washington." Dkt. 38-2. Although this posting indicates that NRF is involved in the hiring process for leadership of KIC, it does not contradict NRF's evidence that NRF does not *fund* KUSCO or KIC, and the posting shows that the applications are to be submitted to NRF *in Korea*, not in the United States. *Id.* at 4.

Moreover, the record shows that the activity engaged in by NRF in the United States is limited to "identif[ying] and promot[ing] Korea-U.S. joint research projects, strengthen[ing] collaboration[,] and expand[ing] networks with research institutions across the U.S." Dkt. 37-1 ¶ 16; *see also* Dkt. 15 ¶ 256 ("[KIC] design[s] and execute[s] programs that help Korean startups enter the U.S. market by facilitating investment, forming commercial partnerships, and enabling technology transfer as venture capitals ('VC') do."). As Defendant notes, courts have held that these types of activities are unique to a sovereign and do not constitute commercial activity that falls within the FSIA exception. *See Kato v. Ishihara*, 360 F.3d 106, 111-12 (2d Cir. 2004) (holding that plaintiff's employment as a marketing agent did not constitute commercial activity where the defendant provided "general business development assistance, including product promotion, to Japanese businesses seeking to engage in commerce in the United States"); *Best Med. Belg., Inc. v. Kingdom of Belg.*, 913 F. Supp. 2d 230, 237 (E.D. Va. 2012) (holding promotion of a foreign region and investment incentives were not a commercial activity under the FSIA); *cf. Salman v. Saudi Arabian Cultural Mission*, 2017 WL 176576, at *5 (E.D. Va. Jan. 17, 2017) (holding that the Saudi Arabian Cultural Mission's efforts to "effectuate its educational policy" for Saudi Arabia did not constitute "commercial activity"). Despite Plaintiff's analogies to a private sector "venture capital-backed startup incubator" or "travel agency," courts look past such "superficial[] similar[ities]." *Kato*, 360 F.3d at 111-12. As another District Judge in this District has explained, "[w]hile a private company may send representatives to another country for the sake of promoting *its own* business, the company would not promote other businesses or the country's business in general." *Best Med. Belgium, Inc.*, 913 F. Supp. 2d at 238 (emphasis in original). Accordingly, "[a]n agency organized to promote the interests or commerce of a country or region certainly engages in this type of broad promotion not undertaken by private entities." *Id.*

"In other words, the fact that a government instrumentality . . . is engaged in *the promotion of commerce* does not mean that the instrumentality is thereby engaged in *commerce*." *Kato*, 360 F.3d at 112 (emphasis in original).  Indeed, as the Second Circuit has stated, "[t]he promotion abroad of the commerce of domestic firms is a basic—even quintessential—governmental function." *Id.*

In response, Plaintiff argues that, even if "[p]romoting Korean research abroad" is sovereign activity, "paying salaries [and] supervising staff" is commercial activity.  Dkt. 31 at 4. But the fact that a foreign sovereign supervises and pays employees to effectuate its sovereign activities does not make those activities commercial.  *See Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000) (holding FSIA barred suit by private security contractor tasked with protecting the Saudi royal family who was, at the direction of the Saudi government, allegedly denied a promotion due to her gender, by analyzing the foreign state's activity achieved by employing the security firm, rather than the employment itself); *Kato*, 360 F.3d at 109 (holding FSIA barred suit alleging sexual harassment by analyzing the foreign state's activity achieved through plaintiff's employment, rather than the employment itself); *Salman*, 2017 WL 176576, at *5 (same).  Accordingly, Plaintiff's argument is not well-taken.

Thus, for the foregoing reasons, the Court finds that it lacks subject matter jurisdiction over NRF because it is immune from suit under the FSIA.  Accordingly, the claims against NRF will be dismissed, and NRF will be removed as a defendant in this action.

B.  Disparate Treatment – Count 1 (Title VII); Count 5 (VHRA)

The Court thus turns to the substantive claims as to the remaining Defendants.  As a preliminary matter, the Court will analyze Plaintiff's Title VII and VHRA claims together, because Title VII and the VHRA use substantially identical language.  *See, e.g.*, *Rose-Stanley v. Virginia*,

2015 WL 6756910, at *4 (W.D. Va. Nov. 5, 2015) (noting that, because plaintiff "has not stated any viable claim under federal law, she cannot claim an unlawful discriminatory practice under the VHRA"); *see also McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language").

Beginning with Plaintiff's sex-based disparate treatment claims, where, as here, a plaintiff does not rely on allegations of direct discrimination, she needs to allege facts that plausibly support inferences of the elements of her discrimination claim, which typically involves asserting the elements of a *prima facie* case of discrimination: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012). Ultimately, to survive a motion for to dismiss, Plaintiff must allege facts sufficient to establish a reasonable inference of discrimination. *See Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (discussing whether allegations are sufficient to support a reasonable inference of discrimination sufficient to support a motion to dismiss).

In this case, it appears that Plaintiff bases her claim on three adverse employment actions: a pay disparity, her discharge, and a collection of incidents in which she alleges she was treated worse than similarly situated male coworkers. With regard to her alleged pay disparity, Plaintiff alleges that she was paid $70,000 per year, but her predecessor was paid more than $100,000 per year. Dkt. 15 ¶ 63. Under Title VII, a "plaintiff may establish a *prima facie* case by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to

higher paying jobs occupied by males." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994). Accordingly, because Plaintiff has alleged that she was paid $30,000 per year less than her predecessor for the same role, she has sufficiently pleaded a *prima facie* case, and the claim will be permitted to go forward on this disparate treatment theory.

Turning to her alleged discharge, Plaintiff here fails to assert sufficient facts to properly allege that her discharge was connected to her gender, rather than some other more plausible factor (such as retaliation). The strongest allegation upon which Plaintiff relies to support her claim of gender discrimination is Operations Manager Songhee Han's comment that Sihoon "likes foxy ladies, so [Plaintiff] should behave like a foxy lady." Dkt. 15 ¶ 71. However, Plaintiff does not plead when this statement was made, and the Court notes that this is the reported perception of a third party, not a comment made by Sihoon himself. Accordingly, considering the other facts that Plaintiff has pled around her termination, this stray remark is insufficient for the Court to infer that the discharge was related to her gender itself, rather than some other reason (such as retaliation). *See Brown v. First Cmty. Bank*, 2019 WL 5445300, at *5 (W.D. Va. Oct. 23, 2019) ("A plaintiff may not prove discriminatory intent by pointing only to 'stray remarks,' which 'lack a nexus connecting them to' the relevant adverse employment decision."), *aff'd*, 814 F. App'x 788 (4th Cir. 2020).

Finally, with respect to the other various incidents alleged by Plaintiff—such as receiving less support and fewer networking opportunities, Dkt. 15 ¶¶ 67-73, her supervisor encouraging insubordination against her, *id.* ¶ 70(b), being criticized for arriving late and working late, *id.* ¶ 73, being called "aggressive," *id.* ¶ 78, and rebuking and publicly humiliating her for something that she was not responsible for, *id.* ¶ 76—and while shameful, these are the kinds of workplace incidents that courts have held do not constitute adverse employment actions because they do not

affect the terms and conditions of employment.[5]  *See Harris v. Esper*, 2019 WL 8888214, at *2 (E.D. Va. Aug. 15, 2019) ("It is well established that ordinary workplace strife cannot constitute adverse employment action, and that verbal reprimands or other alleged harassment do not constitute adverse employment actions unless they affect the terms and conditions of employment." (cleaned up)).  And, to the extent Plaintiff relies on the male Senior Manager and Trainee as comparators to establish that this treatment was gender-based, she has not pled sufficient facts to allow the Court to determine whether these coworkers were similarly situated.  In other words, Plaintiff has failed to "provide evidence that the proposed comparators are not just similar in some respects, but 'similarly-situated in all respects.'"  *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  Indeed, the Senior Manager and Trainee appear to be her subordinates, thus it is reasonable that they would be held to a lower standard and given more support.

Accordingly, for the foregoing reasons, other than her pay disparity claim, Plaintiff's allegations fail to plausible allege facts sufficient to either support a *prima facie* case of disparate treatment or support a reasonable inference of disparate treatment.  Thus, Plaintiff's disparate treatment claim will proceed only with respect to her pay disparity claim.

### C.  Retaliation – Count 2 (Title VII); Count 6 (VHRA)

To state a *prima facie* case of retaliation, a plaintiff must sufficiently allege "(1) that [s]he engaged in protected activity, (2) that the employer took a materially adverse action against [her] and (3) there is a causal connection between the protected activity and the adverse action."  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted).  A materially

---

[5] Even after the Supreme Court's decision in *Muldrow*, the law continues to require that an adverse employment action change the terms or conditions of a plaintiff's employment.  *Muldrow v. City of St. Louis*, Mo., 601 U.S. 346, 359 (2024)

adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006). The resulting harm must be a "*significant detriment*" to the plaintiff and not "relatively insubstantial or trivial." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N.*, 548 U.S. at 68) (emphasis in original). Typically, "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc v. Ellerth*, 524 U.S. 742, 761 (1998)).

Here, Plaintiff engaged in a protected activity when she lodged a complaint with KUSCO on April 5, 2024, about Sihoon's "abusive, harassing, defamatory, discriminatory[,] and retaliatory conduct" and discussed such complaints with Sihoon on April 15, 2024. Dkt. 15 ¶ 83; *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (holding that "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct"). At the meeting, Sihoon told Plaintiff that NRF and KUSCO could not discipline him, that the investigations were only for the sake of going through the motion, and that her complaint would not do any harm to him. Dkt. 15 ¶ 86. Plaintiff also alleges that she sent a further written complaint to KUSCO to be reported to NRF and the Korean Ministry of Science and ICT, and that this complaint was shared with Sihoon. *Id.* ¶¶ 89, 91. Plaintiff alleges that, right after she met with Sihoon a second time on April 29, 2024, Sihoon told Plaintiff that he would extend her trial period, which prevented her from receiving full benefits. *Id.* ¶¶ 93-94. And Plaintiff alleges that, around this time period, Sihoon told at least one KIC employee that he would fire Plaintiff after her program ended in July. *Id.* ¶ 100. On August 27, 2024, Plaintiff was fired.

*Id.* ¶ 113. The Court finds that these allegations are sufficient to state a retaliation claim. Accordingly, these claims will not be dismissed.

D. Hostile and Retaliatory Work Environment – Counts 3-4 (Title VII); Counts 7-8 (VHRA)

Turning to Plaintiff's hostile and retaliatory work environment claims, the Court finds that Plaintiff fails to allege sufficient facts to establish either claim. "[P]laintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). For such a claim to be viable, the Complaint must plausibly allege facts showing that the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult'" which "would reasonably be perceived, and is perceived, as hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993) (quoting *Meritor*, 477 U.S. at 65, 67). To meet this standard, Plaintiff "must offer facts that plausibly support inferences that 'she was subjected to (1) unwelcome conduct, (2) based on her . . . sex, that was (3) severe or pervasive enough to make her work environment hostile or abusive and (4) imputable to [ ] her employer.'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022) (quoting *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020)). Likewise, to state a retaliatory hostile work environment claim, a plaintiff must allege "that the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker form making or supporting a charge of discrimination, and (3) can be attributed to an employer." *Id*. at 218.

To plead that unwelcome conduct was based on sex, a plaintiff must allege "that her protected characteristics under Title VII was the 'but for' cause of the alleged harassment." *Id.* at 210. In other words, a plaintiff must show that she would not have been subjected to harassment, if not for her sex. For example, harassment which includes "explicit and derogatory references to

women" is sufficient to establish but-for causation. *Miller v. Washington Workplace, Inc.*, 298 F. Supp. 2d 364, 374 (E.D. Va. 2004) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000)) (finding sufficient basis in sex where the defendant commented on plaintiff's breasts and asked her about her sex life); *cf. Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012) (finding an insufficient basis in sex for conclusory allegations that male employees made hostile and rude remarks).

Here, as the Court found *supra*, Plaintiff has failed to allege sufficient facts to connect any of the conduct of which she complains to her gender. Moreover, Plaintiff has failed to demonstrate that the alleged harassment from which she suffered was sufficiently severe or pervasive. As an initial matter, "[r]ude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personal conflict with one's supervisor are not actionable under Title VII." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). And Plaintiff's complaints of nitpicking, refusal to provide specific training or support, and other generalized workplace grievances are insufficient to meet the high bar for a hostile work environment claim. *See Coleman v. Whitley*, 2022 WL 16630570, at *3 (4th Cir. Nov. 2, 2022) ("[A]nother employee's rude conduct and refusal to provide training is insufficient to alter the conditions of employment."); *Guillen v. Esper*, 2020 WL 3965007, at *14 (E.D. Va. July 13, 2017) (finding that plaintiff's allegations of "nitpicking," personality conflicts, disliked assignments, and generalized workplace grievances could not establish that the issues were based on plaintiff's protected characteristic and were not enough to state a hostile work environment claim); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003) (holding that plaintiff could not establish a hostile work environment because, although her treatment was often "disrespectful, frustrating, critical, and unpleasant," it did not establish treatment that was "physically threatening, humiliating, or otherwise sufficiently severe

to create a hostile work environment").  Plaintiff also fails to allege when and with what frequency the alleged incidents occurred such that the Court cannot assess the pervasiveness of such incidents.  *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019) (discussing alleged harassment over a period of time and holding that "this conduct is too remote to be pervasive"); *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 408-09 (4th Cir. 2022) (recognizing that "large temporal gaps between allegations undermine a hostile-work-environment claim" and suggest "occasional problems, not pervasive ones").  Accordingly, Plaintiff has failed to state a hostile work environment claim based on her sex or gender.

As to her retaliatory hostile work environment claim, Plaintiff alleges that after her complaints, Sihoon "scrutinized [Plaintiff's] communications and even appeared to have monitored her computer access, wrongfully accused her of attempting to access other employees' personnel files, withheld all support, subjected her to an exceptionally unfairly massive workload, undermined and humiliated her and encouraged her subordinates to be insubordinate to her, and falsely accus[ed] her of poor communication skills." Dkt. 15 ¶ 105.  Many of these allegations are too conclusory for the Court to rely upon, and Plaintiff fails to allege when the more specific allegations occurred such that the Court cannot assess whether they were sufficiently pervasive.  And, as with her gender-based hostile work environment claim, the Court does not find that these allegations are sufficiently severe to state a claim.  *See Buchhagen v. ICF Int'l Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (dismissing Plaintiff's hostile work environment claim because allegations of supervisor mockingly yelling at Plaintiff in one meeting, yelling and pounding her hands on desk in another meeting, harping on mistakes, unfairly criticizing Plaintiff, making snide comments, and playing favorites with employees fall "far short of being severe or pervasive enough to establish an abusive environment"); *Roesinger v. Pohanka of Salisbury, Inc*., 2024 WL

701776, at *3 (4th Cir. Feb. 21, 2024) ("Undesirable work assignments, a boss who plays favorites and criticizes one's work, colleagues who give the cold shoulder, and 'the sporadic use of abusive language' are 'ordinary tribulations of the workplace' that, while unfair and hurtful, do not implicate Title VII.").

Accordingly, Plaintiff has failed to state either a gender-based or retaliatory hostile work environment claim, and these claims will be dismissed.

### E.  Equal Pay Act – Count 9

"Equality under the Equal Pay Act is a demanding threshold requirement." *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019), *as amended* (Mar. 26, 2019).  "It requires a comparator to have performed work 'virtually identical' (or the apparent synonym, 'substantially equal') to the plaintiff's in skill, effort, and responsibility." *Id.* at 204 (quoting *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 332-33 (4th Cir. 2004)).  "A plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor." *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994).  The essence of Plaintiff's claim is that her predecessor was a man that was paid $100,000 per year, while she was paid $70,000 per year for the same role.  Dkt. 15 ¶¶ 62-63.  Accordingly, Plaintiff has alleged sufficient facts to state a *prima facie* case, and this claim will not be dismissed.

### F.  Virginia Equal Pay Act – Count 10

The Virginia Equal Pay Act provides that it "shall not apply to employers covered by the Fair Labor Standards Act of 1938 as amended."  Va. Code § 40.1-28.6.  Defendants argue that because Plaintiff alleges that Defendants violated the FLSA, her VEPA claim must fail.  Dkt. 24 at 17.  However, courts have held that, "[a]lthough [a plaintiff] may be unable to prevail on both theories, at this stage, [the plaintiff] is entitled to allege alternative facts and theories which support

different and contradictory claims for relief." *Jordan v. Osmun*, 2016 WL 7173784, *7 (E.D. Va. Dec. 8, 2016) (quoting *McKay Consulting, Inc. v. Rockingham Mem'l Hosp.*, 665 F. Supp. 2d 626, 632-33 (W.D. Va. 2009)). Federal Rule of Civil Procedure 8(d)(3) also states that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Accordingly, Plaintiff's VEPA claim will not be dismissed on this basis.

### G. Virginia Whistleblower Protection Act – Count 11

As to Plaintiff's VWPA claim, Sihoon argues that he does not qualify as an "employer" under the statute. Under the statute, "'[e]mployer' means an individual, partnership, association, corporation, legal representative, receiver, trustee, or trustee in bankruptcy doing business in or operating within this Commonwealth who employs another to work for wages, salaries, or on commission and shall include any similar entity acting directly or indirectly in the interest of an employer in relation to an employee." Va. Code § 40.1-2. Here, Sihoon is not plausibly alleged to be Plaintiff's employer, but is instead referenced merely as her supervisor. *See Moschetti v. Off. of the Inspector Gen.*, 2022 WL 3329926, at *10 (E.D. Va. Aug. 11, 2022) ("While Westfall supervised Moschetti at OSIG, he did not *employ* her within the meaning of [the Virginia Whistleblower Protection Act]." (emphasis original)). The Supreme Court of Virginia has similarly held that individuals are not included as "entities" in Va. Code § 40.1-2. *See Cornell v. Benedict*, 301 Va. 342, 351 (2022). Accordingly, this claim will be dismissed as to Defendant Sihoon.[6]

---

[6] The Court notes that Title VII and the VHRA also do not permit a suit against an individual unless that individual himself (rather than, for example, his company) qualifies as a plaintiff's "employer" under the statutes. *See Motley v. Virginia*, 2017 WL 1135613, at *4 (E.D. Va. Mar. 24, 2017) ("[N]either the ADEA nor Title VII permit suit against individuals as 'employers.'"). This argument was not, however, raised in any of the Motions and, thus, the Court does not rely on it in reaching any of its determinations here.

H.  Intentional Infliction of Emotional Distress – Count 12

Sihoon also challenges Plaintiff's IIED claim.  In *Womack v. Eldridge,* 215 Va. 338, 342 (1974), the Supreme Court of Virginia recognized IIED as a cause of action in Virginia.  IIED has four elements:  "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe."  *Harris v. Kreutzer*, 271 Va. 188, 203 (2006).  A defendant may be found liable for IIED only if the conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Russo v. White*, 241 Va. 23, 27 (1991).  Here, Plaintiff alleges that Defendant Sihoon "publicly criticized," "scolded," "humiliated," and "publicly rebuked" Plaintiff.  Dkt. 15 ¶¶ 73, 76.  However, "[i]nsensitive and demeaning conduct does not equate to outrageous behavior."  *Harris*, 271 Va. at 204 (holding allegations that defendant "verbally abused [plaintiff], raised his voice to her, caused her to break down into tears . . . , stated she was 'putting on a show,' and accused her of being a faker and malingerer" were insufficient for IIED).  Accordingly, Plaintiff's IIED claim will be dismissed.

I.  *Bowman* Claim – Count 13

In *Bowman*, the Supreme Court of Virginia recognized a "limited exception to the employment-at-will rule," and held that plaintiffs could vindicate a wrongful discharge that constituted a violation of public policy enshrined in statute.  *Doss v. Jamco, Inc.*, 254 Va. 362, 366 (1997) (explaining *Bowman*).  On the other hand, "[t]he Supreme Court of Virginia has long held that 'where a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise.'"  *Williams v. TMS Int'l LLC*, 2021 WL

4071868, at *5 (E.D. Va. Sept. 9, 2021) (quoting *Sch. Bd. v. Giannoutsos*, 380 S.E.2d 647, 649 (Va. 1989)). Accordingly, "[n]umerous Virginia courts have found that 'statutes containing their own remedy cannot also support a *Bowman* claim.'" *Vinson v. City of Richmond*, 2023 WL 4850172, at *9 (E.D. Va. July 28, 2023) (citations and internal quotation marks omitted) (discussing interaction of *Bowman* and the VHRA); *see also Carmack v. Virginia*, 2019 WL 1510333, at *13 (W.D. Va. Apr. 5, 2019) ("If the termination is in violation of stated public policy, the law does not permit the aggrieved employee to pursue a common law remedy when a statutory remedy is clearly enunciated." (citations and internal quotation marks omitted)) (collecting cases); *Williams*, 2021 WL 4071868, at *5 (same).

Here, Plaintiff asserts that her *Bowman* claim is based on the public policy embodied in the VWPA.[7] The VWPA creates a private right of action, providing that "[a] person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction[.]" Va. Code § 40.1-27.3(C). The VWPA further provides that "[t]he court may order as a remedy" (i) an injunction, (ii) reinstatement, and (iii) compensation. *Id.* "Because the VWPA creates a cause of action and provides its own remedy, it cannot support a common law *Bowman* claim." *Mirshahi v. Patient First Richmond Med. Grp., LLC*, 2024 WL 3823991, at *8 (E.D. Va. Aug. 13, 2024). Accordingly, because Plaintiff fails to state a viable employee public policy *Bowman* claim, this claim will be dismissed.

### J. Vicarious Liability – Count 14

Defendant KUSCO also challenges Plaintiff's vicarious liability claim. Dkt. 27 at 19. Plaintiff asserts that the vicarious liability claim is for Plaintiff's IIED claim. Dkt. 33 at 7. Because

---

[7] Plaintiff cannot premise any *Bowman* claim on the VHRA as the Supreme Court of Virginia has recognized that, by statute, plaintiffs are explicitly forbidden from reliance on the VHRA when prosecuting a *Bowman* claim. *See Doss v. Jamco, Inc.*, 254 Va. 362 (1997).

the Court will dismiss Plaintiff's IIED claim for the reasons explained *supra*, the Court will likewise dismiss the vicarious liability count.

*** 

## IV.  CONCLUSION

Accordingly, it is hereby ORDERED that Defendant National Research Foundation of Korea's Motion to Dismiss (Dkt. 20) is GRANTED; and it is

FURTHER ORDERED that Defendant Korea Innovation Center's Motion (Dkt. 23) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Defendant Korea-U.S. Science Cooperation Center's Motion (Dkt. 26) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Defendant Sihoon Ryu's Motion (Dkt. 17) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that the Amended Complaint is DISMISSED as to Defendant National Research Foundation of Korea only and Defendant National Research Foundation of Korea is TERMINATED as a defendant in this case, without leave to amend; and it is

FURTHER ORDERED that Counts 3, 4, 7, 8, 12, 13, and 14 are DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that Counts 1 and 5 are DISMISSED WITHOUT PREJUDICE except to the extent they are based on a theory of pay disparity; and it is

FURTHER ORDERED that Count 11 is DISMISSED as to Defendant Sihoon Ryu; and it is

FURTHER ORDERED that, because this Court cannot say that amendment would be futile at this time, Plaintiff may file one further amended complaint on or before Friday, April 3, 2026,

31

except with respect to any claims as to Defendant National Research Foundation of Korea against which claims cannot be asserted under the FSIA.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 11, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge